**Bridget Colbert, Appellee, v. Holland Furnace Company, Appellant.**

**Gen. No. 30,523.**

1. APPEAL AND ERROR—*what cannot be incorporated in record by certificate of judge.* Facts indicating that failure to settle the bill of exceptions in time was due to the fault of the appellant's attorney can be preserved only by bill of exceptions and cannot be incorporated in the record by a certificate of the trial judge.

2. NEGLIGENCE—*sufficiency of evidence to support inference of defective construction of air shaft grating and knowledge thereof by employees of installing company.* Evidence in an action for personal injuries due to the giving way of the grating covering the cold air shaft of a furnace in the home of the plaintiff and her husband, installed therein under a contract between defendant and plaintiff's husband, held to warrant the jury in concluding that the construction in question was obviously defective and known to be such by the agents and employees of the defendant who constructed it.

3. PLEADING—*when omission of essential averment of complaint cured by verdict for plaintiff.* Where in an action for injury due to the giving way of a defectively constructed grating covering the cold air shaft of a residence furnace the evidence required an inference that the company that installed the furnace was chargeable with knowledge of the defective construction aforesaid, the failure of the plaintiff to plead such knowledge was cured by the verdict in her favor.

4. NEGLIGENCE—*persons liable in absence of privity of contract.* Under the principle imposing on all the duty to avoid acts immi-

nently dangerous to others and creating liability for defective construction the natural consequence of which is injury to another, a contractor who installed a furnace with a defective floor grating resulting in injury to a person stepping thereon, is liable even though there is no privity of contract with the person injured, the rules exempting an independent contractor not applying in such cases.

5. Negligence—*sufficiency of evidence to support verdict for plaintiff in action for injuries by fall due to giving way of defectively constructed cold air shaft grating.* Where the evidence in an action for personal injuries due to the giving way of the grating covering the cold air shaft of a residence furnace, installed therein under contract between the defendant and the plaintiff's husband, warranted an inference that the giving way of the grating was due to the breaking of a cross-grained cleat which supported it, that such construction was obviously defective and known to be such by defendant's agents who installed the furnace, the jury were warranted in finding that the defendant was guilty of negligence proximately causing plaintiff's injury, notwithstanding the accident occurred more than a year after the completion of the work and its acceptance by plaintiff's husband.

6. Negligence—*when evidence insufficient to show causal relation between negligently caused fall of plaintiff and subsequent displacement of uterus.* The verdict of the jury, in an action for injuries due to a fall caused by the negligence of the defendant, that as a proximate result of such fall plaintiff suffered a displacement of the uterus, held against the greater weight of the evidence.

Appeal by defendant from the Superior Court of Cook county; the Hon. John J. Sullivan, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1925. Affirmed on remittitur; otherwise reversed and remanded. Opinion filed October 5, 1926.

John Vennema and John A. Bloomingston, for appellant.

Quin O'Brien, for appellee.

Mr. Justice Barnes delivered the opinion of the court.

This is an appeal by defendant from a judgment for $8,500 in an action of trespass on the case for per-

sonal injuries from a fall resulting from the giving way of a support to a register or grating installed with a furnace in the home of plaintiff and her husband, Martin J. Colbert, pursuant to a written contract with the latter.

The grounds urged for reversal rest upon the bill of exceptions, which appellee has moved to strike.

It appears that the time for filing the bill expired May 27, 1925, that it was handed to the court May 25, by attorney for appellant, and noted by the court as then presented, that on July 16 following it was presented for approval, the attorneys for both parties being present, and the same was then signed and filed *nunc pro tunc* as of May 25, 1925, without, so far as the record shows, the interposition of any objection. Prior thereto there was spread on the record under date of June 4, 1925, the following:

"I, as judge of said court hereby certify and enter on the records of this court in the above entitled cause, the facts that a certain volume of papers purporting to be a proposed draft of a bill of exceptions was presented to me for signature by the attorney for the defendant, in the above entitled cause, in the absence of the plaintiff, and her attorney, that I signed the same as presented without reading or approving it, and immediately it was taken away from the presence, possession and custody of the court by defendant's said attorney, and has not been returned to this court since, although the court, and the attorney for the plaintiff in this court has since made repeated demands on the court, and defendant's attorney for its return, that he may examine it, and has made motions to that effect, but defendant's attorney has refused and failed to return it."

The motion to strike is based on this so-called part of the record on the theory that it shows the delay in settling the bill of exceptions until after May 27 was due to the conduct of appellant's attorney and

not to any fault or delay of the judge or opposing counsel.

If such a state of facts was properly in the record we would grant the motion. Recitals in a record cannot be substituted for a bill of exceptions. (*Grand Pacific Hotel Co. v. Pinkerton,* 217 Ill. 61.) Any such motions as referred to in said entry, or facts on which they were predicated, could be preserved and become a part of the record only by a bill of exceptions. (*People v. Levin,* 318 Ill. 227.) For aught that appears to the contrary, the matters so recited were conveyed to the court's attention, not in the exercise of any judicial function or in the course of any recognized judicial procedure, but by ex parte parol statements which can form no part of the transcript of the proceedings of a common-law court. (*Baltimore & P. R. Co. v. Sixth. Presbyterian Church,* 91 U. S. 127, 23 L. Ed. 260.) The court may as well have spread of record a mere conversation about such matters. It is fundamental that the record of a court is a history of a judicial proceeding had under some recognized form wherein all parties interested may be heard or have their day in court. The entry in question does not purport to record such a proceeding. We cannot, therefore, regard it as a part of the record or properly in the transcript. The motion to strike the bill of exceptions must be denied.

As the declaration charges in substance negligence in defective construction of the support of the grating, done under a contract with plaintiff's husband, it is urged as a ground for reversal that defendant owed no duty to plaintiff because of no privity of contract between them. The contract is in the form of a written proposal addressed to "Mr. and Mrs. Martin J. Colbert," and accepted in writing by him only. Accompanying the same, which must be considered as a part of the contract, is a bond executed by defendant guaranteeing the material and workmanship

against defects, in which defendant certifies that the furnace "was installed for Martin J. Colbert." Plaintiff did not sign the contract, and is not mentioned or referred to in any way in the body of either instrument, and therefore cannot be regarded as privy to the contract. Appellee's contention to the contrary, because the proposal is addressed to both husband and wife, is not consistent with these facts, nor with its declaration charging contractual relation with the husband only.

In view of such contractual relation, appellant invokes the general rule that "where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it has been accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as a result of defective construction or installation." The rule is stated in this language in *Healey v. Heidel,* 210 Ill. App. 387, 390, and in *Wood v. Sloan,* 20 N. M. 127, which is also reported in volume 12, Negligence and Compensation Cases Annotated, p. 562, where cases involving the doctrine and the exceptions thereto are elaborately discussed, to which both parties refer, appellant claiming the facts of this case bring it within the rule, and appellee, that they bring it within one or more of the exceptions.

Whether the instant case comes within any of the exceptions depends upon the following state of facts pertaining to the construction, which the evidence tends to support:

The grate was 12½ inches wide by 2½ feet long. It was placed over the opening for a cold air shaft cut through the kitchen floor below a window in the north wall about a foot therefrom, where it was walked over or stood on like any other portion of the floor. The opening for the grate was made by sawing through the flooring consisting of an upper

layer of hard wood and a lower layer of pine with a sound-proof lath between them, making a thickness of 2⅛ inches. There were no supports lengthwise for the grate, but across its width about the middle was a joist raised by tin work to the grate, and 1¼ inches below the floor level each end was supported by a cleat consisting of a pine plaster lath 12½ inches long, ⅜ of an inch thick, and 1⅝ inches wide; that at the east end was nailed to a joist flush with the opening, and that at the west end to the ends of the projected pine subflooring, the nearest joist being west of and not flush with the opening. The nails were roughened or corrugated roofing nails ⅞ of an inch long. Seven were placed in each cleat. The middle joist aforesaid was the only one under the grating. The thickness of the flooring being 2⅛ inches, and the cleats 1¼ inches below its top, the west cleat, therefore, was nailed against only ⅞ of an inch of the ends of the soft subflooring, and the nails tapering to a sharp point pierced the soft flooring only ½ inch.

The accident was due to the giving way of the west cleat when the grate was stepped on by plaintiff, causing her left leg to go down the shaft between the middle joist and the west end of the opening. The cleat, certified as an exhibit, and other proof, disclose that it was cross-grained and had a break or crack at one end following the cross-grain where two of the nails had been driven, and that the other nails must have pulled out of the soft flooring when the cleat gave way.

From such a state of facts we think the jury were justified in reaching two conclusions: (1) That the construction was obviously defective, and (2) known to be such by defendant's carpenter or agent who constructed it and whose knowledge must be imputed to defendant corporation. We think there is ample evidence from which a jury would reasonably find that such support was insufficient for the use to which the

grate as a part of the floor would reasonably be subjected, and that the person constructing it would have anticipated that it might become dangerous to those who might so use it.

This state of facts presents the question whether or not they bring the case within a recognized exception to the general rule above stated.

Many attempts have been made by the courts and text-writers to classify facts constituting such exceptions. It may be doubted, however, whether they are sufficiently comprehensive to include all cases. Some cases referred to as supporting such exceptions are not free from obscurity as to the precise principle upon which they rest, and are not altogether consistent. One difficulty in bringing the instant state of facts within attempted classifications is that most of the illustrative cases thereunder relate to articles manufactured for sale and involve a duty to the public or the doctrine of implied invitation, neither of which is involved here. But the facts here would seem to come within the doctrine and exception stated as follows in 29 Cyc. p. 484: "One who supplies a thing for such use by others that it is obvious that any defect will be likely to result in injury to those so using it is liable to any person who, using it properly for the purpose for which it is supplied, is injured by its defective condition." Among cases cited there in support of the doctrine are *Hayes v. Philadelphia & R. Coal & Iron Co.*, 150 Mass. 457, where plaintiff's employee was injured by defective tackle and appliances furnished by defendant to be used in unloading coal for plaintiff's customers; *Connors v. Great Northern Elevator Co.*, 90 App. Div. 311, 85 N. Y. Supp. 644, presenting an analogous state of facts; *Bright v. Barnett & Record Co.*, 88 Wis. 299, 26 L. R. A. 524, where defendant furnished defective staging for the use of employees of a company on which to stand or walk in doing their work, and the death of one of them re-

sulted from walking over a defective board that broke where it had a bad knot, and *Devlin v. Smith*, 89 N. Y. 470, where a third person was injured by defects in a scaffold built by an independent contractor.

In the last cited case the court emphasized the fact that any defect or negligence in the construction, which should cause it to give way, would naturally result in a serious injury, and presented a strong case of liability to third parties to the contract because of the natural and necessary consequence of the builder's negligence. This exception is also recognized in 16 Amer. & Eng. Encyc. of Law, p. 210, and Cooley on Torts (3d Ed.), vol. 2, p. 1489.

A case quite similar to that of *Bright v. Barnett & Record Co., supra,* is *Mulchey v. Methodist Society,* 125 Mass. 487. The principle of liability on which the latter and some other cases are based is that of implied invitation. But the *Bright* and *Devlin* cases, *supra,* recognize liability may rest upon the duty which the law imposes on every one to avoid acts "imminently dangerous" to others, and where serious injury is a natural consequence to any person using the defective article or construction. It is upon this principle, if any, we think, that the facts of this case impose liability upon defendant.

Other illustrations of the exception are found in *Holmvik v. Parsons Band Cutter & Self-Feeder Co.,* 98 Minn. 424; *Krahn v. J. L. Owens Co.,* 125 Minn. 33; *Pierce v. C. H. Bidwell Thresher Co.,* 153 Mich. 323. They are distinguishable in the fact that in each case the defect was in a machine or implement manufactured for sale, the use of which by third parties was manifestly contemplated. But it is no less a fact that in the present case the use of the floor in the kitchen, including the grate, was manifestly intended for use by any inmates of the household. In the last cited case the court suggested that in such connection the words "imminently dangerous" convey the meaning

that the danger may be impending but do not mean instant consummation.

While other cases illustrative of the exception might be cited, the cases of defective construction in work specifically contracted for are not numerous. One disclosing facts more analogous to those in the instant case than any other called to our attention is that of *Wood v. Sloan,* 20 N. M. 127, relied on by both parties. In that case the tenant of a building was injured by stepping on an insecurely supported board projecting from the wall underneath a wash stand. Suit was brought by the injured tenant against the parties employed to install the wash stand. A board removed from the floor in the course of installation was replaced without supporting one end of it by a cleat so as to render it safe. Discussing in the case the general rule above stated and various exceptions to it, the court held that the essential element to liability in such a case, that the defendant must have had knowledge of the defect and danger, was lacking, but recognized that where the facts are such as to show that the defendant was so situated with reference to the instrumentality that the defect and dangerous character must be apparent to him, if he would look, knowledge must be imputed to him, citing 2 Cooley on Torts, p. 1491. It is not apparent from the opinion how the court reached the conclusion that defendants did not know of the defect and dangerous character of the work. But from the facts in this case we think knowledge must be inferred, and while it was not expressly pleaded, as should have been done, we think it would be implied from the facts pleaded and that, therefore, the defect was cured by verdict. (*Sargent Co. v. Baublis,* 215 Ill. 428.)

Because plaintiff stood on the grate to wash the window near it, it is urged that the grate was subjected to an unusual strain. As one engaged in such work might naturally be expected to stand on the most

convenient part of the floor, we do not think this contention is well founded.

That the accident did not happen at once but some thirteen months after the work was completed is no criterion that the danger was not imminent or impending, even though the grate might have been subjected to like pressure before. Reasonably safe construction contemplates continued safety subject to ordinary wear and tear or defects incident to lapse of time. But if the construction is such that danger may be anticipated therefrom by reason of its very defects it is imminent or, as said in some cases, inherent, even though it does not occur immediately or soon after use.

Nor do we think it can be assumed from the evidence that the owner accepted the work with chargeable knowledge of its defective construction. It was hidden from ordinary observation. It may be inferred that the cleat gave way because of the break along the cross-grain at one end of it, thus weakening the hold of the remaining short pointed nails driven only one half an inch into the soft flooring in the direction of the grain. In accepting the work one would hardly be charged with inspection of such minute details. Inasmuch as it was thus hidden from view, and obviously known to be defective by the one doing the work, who must be deemed chargeable with knowledge of its requirements for reasonable safety, and to have anticipated danger from its defective construction to persons rightfully walking over the grate, we are constrained to regard the case as one within the recognized exceptions to the general rule which imposes liability to third persons for injuries resulting from defective construction of an imminent dangerous character known as such to the contractor when made.

We think the jury were amply justified in finding from the evidence that defendant was guilty of negligence in the respect charged, and cannot agree with

appellant's contention to the contrary, or with its respective claims that the proof was insufficient to sustain the charge, that the construction involved an engineering problem requiring expert testimony to determine its sufficiency, and that defendant owed no duty to the plaintiff.

But it is urged that if there is any liability the most serious injuries complained of were not the proximate result of the accident, and that the damages are excessive.

The accident happened on December 3, 1921. When plaintiff fell her left leg went down into the shaft up to her hip, and her right leg doubled up under her and her body was brought forward. There is no claim that the body struck anything as it came forward. She testified that she had black marks along her leg and bruises on her shin, hip and abdomen. Dr. King, who was called and saw her that evening, testified that he observed nothing but bluish marks along the knee, and that she complained of pains in her leg and along the lumbar region of the back. He gave her capsules for headache and prescribed liniment for the leg. Three days later she came to his office and complained of headache and her back, but made no complaints indicating pelvic troubles. In January she went to a chiropractor, from whom she received treatment along the spine for about four months. She made two or three visits to two other doctors, Dr. Monahan and Dr. Meyers, during that year, and one to the latter in the spring of 1923, neither of whom prescribed any treatment. In October, 1923, she went to Dr. Epstein, who operated on her at St. Bernard Hospital October 23, 1923. The operation consisted of an amputation of the cervix or neck of the womb, removal of a fallopian tube and ovary, and supporting a retroverted womb by bringing up and sewing the round ligaments that support it to the abdominal wall. None of these doctors, except Dr. Epstein, was called to tes-

tify in her behalf. Dr. King was called as a witness by defendant.

To connect her pelvic troubles with the accident defendant relies mainly on the testimony of Dr. Epstein. He testified that he found the womb was retroverted back on the spine; that it was large and heavy and showed signs of passive congestion; that the cervix was ulcerated and the tube and ovary inflamed and thickened from the inflammatory process. Answering a hypothetical question he expressed an opinion from a medical and surgical standpoint that such a fall and accident were sufficient to cause such retroversion and such condition of the fallopian tube and ovary, and the pain, headache, suffering and nervousness complained of by plaintiff.

Three physicians specializing in surgery and gynecology, called by defendant, testified to the effect that the pelvic conditions referred to would not ensue from such a fall, and were due to infection. On cross-examination Dr. Epstein admitted that in most every case he had ever operated on he found the fallopian tubes and ovary thickening was due to some type of infection, and that is what a surgeon first thinks of. He did not recall whether there were lacerations of plaintiff's uterus or not, but, if so, he would attribute them to childbirth only; but said she had a chronic salpingitis (inflammation of the tubes). It appeared, however, that Dr. Epstein's written diagnosis before the operation stated that there was salpingitis, chronic erosions and lacerations of the uterus, all of which he admitted might follow in the pathological course of childbirth. Plaintiff had given birth to four children, the intervals between each birth being about two years, the last child having been born about seven years before the trial.

At the time of the operation Dr. Church, a witness for defendant, was pathologist at the hospital and made a written report of the microscopical analysis of

the organs removed by the operation. The report indicated an overgrowth and enlargement of the cervix, together with lacerations and ulcerations. He testified that such lacerations follow many cases of childbirth and that infection was the cause of the conditions found.

Dr. Curtiss, a physician and surgeon since 1905, who in the capacity of gynecologist is connected with St. Luke's Hospital, and is professor in the Northwestern University Medical School, was also called by defendant and testified that the most common causes of misplacement of the womb is childbirth, and salpingitis, which is caused by infection; and that the same germs which cause the inflammation of the neck of the womb also cause inflammation of the fallopian tubes, and that there is no other cause except a germ cause known. He testified that he had never seen a case where displacement of the uterus was occasioned by a fall unless there were other and more severe physical evidences of injury, and that a person's ability to walk about within a few minutes after a fall, as plaintiff was able to do, was inconsistent with injuries of that character; that he had never heard of salpingitis being caused by such a fall; that germs were always present to develop it, and it could not be a direct result of violence; and that retroversion develops gradually.

Defendant also called Dr. Vaughan, who had been connected as surgeon with several hospitals and is an instructor in and assistant professor of surgery of Rush Medical College, and attending physician for the last nine years at the County Hospital. He testified that he had never known of retroversion of the womb as the result of a fall, that one of the most common causes thereof was childbirth, particularly the infections following it. He described conditions, not present in this case, that would have ensued if such pelvic disorders were possible from such a fall, and said that

a displacement of the uterus from such a fall would be highly improbable. His testimony as to the causes of such pelvic conditions conformed to the theories of medical science testified to by defendant's other medical experts, who appear to be men of wide experience and learning in the specialty involving knowledge of pelvic conditions, and whose scientific reasons for their conclusions are not impeached. We are disposed to give them much more weight than the testimony of a single practicing physician whose evasiveness at critical points of his cross-examination serves to detract from the weight of his testimony. There was no evidence tending to impeach the scientific theories of defendant's experts and the soundness of their conclusions, unless we accept the bare opinion of Dr. Epstein in answer to the hypothetical questions as aforesaid. Whether or not the pelvic conditions of plaintiff were the proximate result of the fall had to be decided mostly, if not entirely, on such expert testimony, which we think manifestly preponderates against plaintiff's theory.

In this connection it is somewhat significant that plaintiff called none of the physicians she had consulted during the twenty-two months between the time of the accident and the time she saw Dr. Epstein, although she had begun her suit nearly a year before consulting the latter.

If the jury might reasonably find that the injuries for which plaintiff ultimately went through such operation were the proximate result of the fall, we would not disturb the verdict. While it was their function to pass upon that question we cannot, after a careful review of the evidence, regard their conclusion as justified by the greater weight thereof.

But while from this conclusion we must regard the damages as excessive, we cannot say that there was not sufficient evidence from which the jury might find that the fall incapacitated her for doing the work she

was accustomed to do prior to that time, including general housework, washing, cleaning, cooking, etc., and work as a saleswoman in a store, at which she earned about $15 a week, and that much of the suffering, pain and nervousness thereafter, which she had not previously experienced, were directly attributable to the accident, and were not necessarily connected with the slow development of disorders for which she underwent an operation a year and eleven months afterwards, and of which she apparently had no symptoms previous to the fall.

We recognize the difficulty of drawing the line for the assessment of damages in such a case. They are not capable of exact computation, but must be reasonable. That better testimony on the subject could be had in another trial is highly improbable. If the pelvic disorders for which she underwent the operation be eliminated from the results of the accident the evidence would not, in our opinion, sustain an assessment of more than half of the verdict. In the absence of any indication that the jury were actuated by passion or prejudice, the judgment is affirmed for $4,000 if appellee will remit $4,500 from the judgment within ten days from the filing of this opinion. Otherwise the judgment will be reversed and the cause remanded.

*Affirmed in case of a remittitur; otherwise reversed and remanded.*

GRIDLEY, P. J., and FITCH, J., concur.