OTTIE C. ROUSH, *Admr.*, OF ESTATE OF ROY JEFFERS, *Deceased, D. E.,*

*v.*

DEWEY R. JOHNSON, D. B. A. WEST VIRGINIA DISTRIBUTING COMPANY, *et al.,*
WOODRUM HOME OUTFITTING CO., *a Corporation, P. E.,*

(No. 10590)

and

OTTIE C. ROUSH, *Admr.,* OF ESTATE OF ROY JEFFERS, *Deceased, D. E.,*

*v.*

DEWEY R. JOHNSON, D. B. A. WEST VIRGINIA DISTRIBUTING COMPANY, *et al.,*
DEWEY R. JOHNSON, *D. B. A.* WEST VIRGINIA DISTRIBUTING CO., P. E.

(No. 10591)

Submitted January 20, 1954. Decided March 30, 1954.

610

*Jackson, Kelly, Holt and Moxley, W. T. O'Farrell, W. J. Carter,* for plaintiff in error, Woodrum Home Outfitting Co., a corporation.

*Edwin O. Thornhill,* for plaintiff in error, Dewey R. Johnson, d. b. a. West Virginia Distributing Co.

*Kay, Casto and Chaney, Dale G. Casto,* for defendant in error.

RILEY, JUDGE:

Ottie C. Roush, administrator of the estate of Roy Jeffers, deceased, instituted in the Court of Common Pleas of Kanawha County this action of trespass on the case against Dewey R. Johnson, doing business as West Virginia Distributing Company, and Woodrum Home Outfitting Company, a corporation, hereinafter referred to as the "distributing company" and the "outfitting company", respectively, to recover damages for the alleged wrongful death of plaintiff's decedent by electrocution. To a judgment in the plaintiff's favor and against the defendants in the amount of ten thousand dollars, the defendants prosecute separate writs of error to this Court to the judgment of the Circuit Court of Kanawha County, refusing writs of error and supersedeas to the judgment of the Court of Common Pleas of Kanawha County as plainly right.

The declaration is in three counts. The first count charges negligence on the part of the distributing company in its installation in September, 1948, of an electric compressor and cooler in the store building owned by Kenton (referred to in the declaration and sometimes in the briefs as "Kenneth") and Bess Garton, located on Field's Creek, Cabin Creek District, Kanawha County; the second count charges that the outfitting company was negligent in the installation in November, 1949, of three electrically operated gas floor furnaces in the storeroom and dwelling house connected therewith owned by the Gartons; and the third count is a consolidation of the first and second counts. All three counts of the declaration charge that the negligence alleged therein proximately caused the decedent's death by electrocution.

After setting out the appointment and qualification of the administrator in July, 1950, the third count of the declaration alleges, in substance, that on or about the 11th day of July, 1950, the date on which decedent was electrocuted, and for a long time prior thereto, the distributing company had been engaged in selling and installing compressors and coolers, and the outfitting com-

pany had been engaged in selling and installing electrically controlled gas floor furnaces; that Kenneth and Bess Garton were the "owners of a certain building used as a dwelling house and storeroom [the two building then being connected], situate on Field's Creek, Cabin Creek District, Kanawha County," in which store building they "operated a grocery store"; that the dwelling and the store building were "properly and carefully wired for the use of electricity including a switch which was placed on the inside wall of a wareroom in said building used in connection with said storeroom."

The third count alleges that on or about the ____ day of September, 1948, the distributing company sold Bess Garton, doing business as "Garton's Grocery", an electrically operated refrigeration unit known as a compressor and beer cooler, and agreed to install the same in the Garton store in a safe and proper manner; that it then and there became and was the duty of the distributing company to install the compressor and cooler in a careful and prudent manner so as not to create a dangerous instrumentality; that not regarding such duty, but in utter disregard thereof, the distributing company carelessly installed the compressor and cooler in such manner that the apparatus was negligently connected with the main switch and fuse box, hereinafter referred to as the "main switch box", so that the compressor and cooler were not protected by the fuses and the switch provided for that purpose, and thereby a dangerous and hazardous instrumentality was created.

The third count of the declaration alleges that in November, 1949, the outfitting company sold to the Gartons and agreed to install in the Garton dwelling and store building in a safe and proper manner three electrically controlled gas floor furnaces; that it then and there became and was the duty of the outfitting company to install the furnaces in a careful and prudent manner; that not regarding such duty, but in utter disregard thereof, the outfitting company negligently and unskillfully connected

with "a switch box installed by" the distributing company, causing a copper tube leading from the compressor to the cooler "to be charged with electricity, said copper tube being located under said grocery store between the floor and the ground."

The third count further alleges that in July, 1950, Kenneth and Bess Garton, the owners of the store building and dwelling, employed and contracted with Vergil Fike to disconnect the store building from the dwelling house, and to move the store building to a new location; that it became necessary for Fike and his employees, including his foreman, the decendent, Roy Jeffers, to go on the premises for the purpose of removing the store building; that on the _____ day of July, 1950, Jeffers and a number of men under him arrived at the Garton property and began work preparatory to moving the store building; that the movers were lawfully on the premises at the invitation and request of the Gartons; and that it thereupon became necessary for the decedent to go under the store building for the "purpose of placing moving equipment thereunder."

It is further alleged in the third count of the declaration that "prior to the time plaintiff's decedent went underneath said building for the purpose of placing said moving equipment thereunder, the electric current leading into the building was disconnected at the [main] switch box, located in the wareroom in said building, so that except for the carelessness, negligence and unlawful conduct of the defendants and their servants, agents and employees, as hereinafter complained of, electricity and electric currents would not have been carried to the electric equipment in said building, where plaintiff's decedent had a lawful right so to be, and plaintiff's decedent relying upon, as he had a right so to do, that the electric current having been disconnected at the [main] switch box * * * and that there was no electricity or electric current running to the electric equipment * * * as installed by the" distributing company and the outfitting

company, he, Jeffers, "went under said building * * * and was killed."

And further the third count alleges that the copper tubing with which decedent came in contact under the floor, was, by virtue of the wiring installed by the defendants, so energized that it caused decedent to be electrocuted.

It is also charged in the third count of the declaration that both the distributing company and the outfitting company "did not use all possible care", as they were required to do, in their separate installations; that the defendants connected the respective separate electrical wiring required by each in such a careless manner, and with such utter disregard of the rights of plaintiff's decedent, that after the main switch in the main switch box was disconnected, electric current continued to pass through the electric wiring to the compressor and the gas floor furnaces. In brief the declaration charges both defendants with improper wiring, and that such wiring resulted in decedent's death. Several times the declaration refers to the "main switch" and "switch box", introduced in evidence as "Plaintiff's Exhibit No. 9", hereinafter referred to as the "main switch" and the "main switch box"; and in the third count of the declaration there is a single reference to "a switch box installed by the said defendant, Dewey R. Johnson, doing business as West Virginia Distributing Co.", which switch box was introduced in evidence as "Plaintiff's Exhibit No. 10", and is hereinafter referred to as the "gray switch box."

The defendants having pleaded the general issue, trial was had thereon. Following the verdict for the plaintiff, the defendants made timely motions to set aside the verdict as contrary to the law and evidence.

The Chesapeake Light and Power Company, a public utility engaged in furnishing electric power and energy, had some time prior to December, 1948, made a service connection at the wareroom adjacent to the Garton storeroom, and the main switch box, containing a double circuit main switch, was installed, by whom the record does

not disclose, on the inside end wall of the wareroom. This switch was wired through the right fuse, where a Romex cable, that is a cable having nonmetallic insulation, was attached, which cable provided for an electric outlet carrying electric current to lights and electrical equipment in the Garton dwelling house and store. No outlet was ever wired through the left fuse in the main switch box.

Joseph T. Stickels, a witness for the defendants, and the distributing company's employee, who had made the installations on the Garton property for the distributing company, testified concerning the manner in which the compressor, cooler, and copper tubing under the floor between the compressor and cooler were installed and wired; and Max McDaniel, the outfitting company's employee, who had installed for the outfitting company the transformers and electrically operated floor furnaces, likewise testified concerning the installation and wiring of the transformers and the electrically operated floor furnaces.

Stickels testified that he did not believe there was sufficient current available through the left unused fuse in the main switch box to take the additional load of the half horsepower unit which he was installing, so he "wired around" the main switch and wired to the "line side" thereof, that is the side of the switch next to the main entry, and in order to take the overload production to another place, he installed the gray switch box in the wareroom on the partition wall between the wareroom and the storeroom, a few feet above the compressor; that he installed a BX cable, that is an armored or metallic cable, connecting the main switch box with the gray switch box, so that the electric current was controlled by the two fuses in the gray switch box; and then the witness extended the wiring by the use of a BX cable from the load side of the switch in the gray switch box, that is the side nearest where the electric current is used, through the fuses to the lower end of the gray switch box, and

thence to the compressor, which had been installed by the witness on the floor immediately below the gray switch box.

From Stickels' testimony, bearing as it does upon the installation made by the distributing company, it further appears that in the gray switch box, the lead or black wire was tied to terminal No. 1 on the line side, and the neutral or white wire was tied to terminal No. 2 on the line side; and the BX cable before it emerged through the bottom of the gray switch box was wired in the gray switch box, so that the lead or black wire was tied to terminal No. 1 on the load side of the switch, and the neutral or white wire was tied to terminal No. 2, also on the load side of the switch. This last-mentioned BX cable was connected with the compressor proper, and no ground connection, not even on the gray switch box, was installed by the distributing company, except that the BX cable, extending from the main switch box to the gray switch box, would have served to render the ground connection on the main switch box useful as a ground also for the gray switch box, were it not for the break in the armor of that cable, unless, as Doran Frame, a witness for the distributing company, testified the ground on the main switch box was broken at a place where it entered the ground near the Garton dwelling. Stickels, however, did not testify whether he had examined the ground on the main switch box, and did not explain why he did not make an independent ground connection on the gray switch box, which the record discloses would have prevented the charging of the BX cable leading from the gray switch box to the compressor, which ultimately caused decedent's electrocution and death.

The copper tubing under the floor of the wareroom and storeroom was two feet, or possibly thirty inches, above the ground under the store property. Several months after the distributing company had made its installations, Stickels made two service calls to the Garton property, one of which required him to come "in direct contact with

the copper tubing." Stickels testified that the copper tubing could be reached by a person only by a "kind of crawling up all the way", and that when he came in contact with the copper tubing on the occasion of the service call, he did not receive any shock from such contact.

McDaniel, who in November, 1949, a little over a year after the distributing company made its installation, had installed in the Garton property for the outfitting company the three electrically controlled gas floor furnaces, one in the Garton dwelling and two in the store building, testified that the transformers, which witness had installed in connection with the furnaces, were used to reduce the current of electricity, so that it would be available for the operation of the automatic electrical controls on the gas furnaces, that is the thermostats. The *modus operandi* of connecting the furnaces, according to McDaniel, was, first, the line wire was run from the transformers to the thermostats, and the transformers were thus connected with the furnaces. Then the Romex cable was inserted by McDaniel through the opening at the upper right side of the gray switch box, and a metal clamp was used to hold the cable rigid. Then the lead or black wire of the Romex cable, running from the gray switch box to the transformers, was fastened to terminal No. 1 on the line side of the block in the gray switch box, and the neutral or white wire of the Romex cable was fastened to terminal No. 2 on the line side of the block, which last-mentioned connections were made on the top of the wires already connected with the two line terminals installed a year before by the distributing company. At the time of the installation of the Romex cable, leading from the gray switch box to the transformers, McDaniel testified that the connector or clamp, which, as heretofore stated, was designed to hold the cable rigid at the place it entered the gray switch box, did not pinch the insulation or create a short. McDaniel further stated that because the main switch box was some distance away from the place where the transformers were to be installed, he attached the furnace circuit in the gray switch box, but witness did not

explain why he did not make any ground connection on the gray switch box.

The record discloses that when Fike's men, that is the decedent, acting as foreman, and the four men under him, bringing with them their moving equipment, arrived on the Garton premises, neither the decedent Jeffers, nor any of the four men under him, made any inquiry as to whether the electric current was on or off, and made no examination as to the electric connection between the gray switch box and the transformers and furnaces, nor did any of the men come into the Garton store. When, however, Fike's men arrived at the Garton property, John Garton, brother in law of Bess Garton, was on a ladder on the porch of the store, where he could be observed by Fike's men, engaged in disconnecting the feeder line running from the main entry to the dwelling house, and then to the receptacle box on the porch of the store.

Bess Garton testified that when Fike's men started to work the "power wasn't cut off. The [main] switch was pulled but the power was on." This witness further testified that "Seems that the power was on after the main switch was pulled. The [main] switch was pulled because it was pulled back in my house."

On the morning of July 11, 1950, there was considerable activity in the vicinity of the store building and the dwelling. Charles Howard Green, an employee of Chesapeake Light and Power Company, and a witness for the plaintiff, was first to arrive at the Garton property. He was there to string a new wire and to install a meter box on the lower end of the dwelling. John Garton seemed to be aiding Green to some extent. John Garton testified that the store building had been constructed prior to the dwelling; that a meter had been installed on the porch of the store following the completion of the latter; and that after the dwelling was finished the electric company did not have any meters, so "they run a feeder line from the intake to the house [dwelling] to the receptacle box on the porch of the store and taken the power from that,

so that it all came through the same meter." This witness testified further that "I pulled the switch in order to disconnect that feeder line from the porch box. Then we would have to carry it around· and across the top of the porch and connect the end of the meter that he was installing." During the dismantling of the "feeder line" from the store building, Jeffers, Fike's foreman, and the four men under him arrived at the Garton property with their moving equipment. One of the movers testified that he noticed someone on the porch with a ladder "fooling" with wires on the store building. Mrs. Bess Garton testified that she knew John Garton had pulled the main switch, because of the effect that it had on the current in the dwelling house. Gaylord Garton, son of Kenton and Bess Garton, who worked in the store and ran a truck, testified that he was late in arising, and that he got up about the time the Fike movers arrived. He stated that he knew the main switch had been "pulled" because he noticed that his electric clock had stopped earlier in the morning. He said he was in and out of the buildings, and stated that Jeffers had been dragged from under the store before he knew of the accident. This witness attempted to contact the distributing company and the outfitting company. Johnson, the owner of the distributing company, came to the Garton property after Jeffers was electrocuted, and took some pictures; but the outfitting company did not have a representative present at the time.

A number of witnesses, evidently highly skilled by reason of a wide experience in various capacities in the mechanics of electrical installations, and in the use, control and actions of electric current, examined the electrical installations involved in this action, and testified in detail as to the conditions which they found at the Garton property shortly· after decedent was killed. Their testimony bears pertinently upon the question whether there is sufficient evidence in this record from which the jury could reasonably have found that both of the defendants, or either of them, were guilty of negligence in making their respec-

tive installations, which proximately caused decedent's death.

Plaintiff's witness, R. E. Perry, an electrical inspector employed by the West Virginia Inspection Bureau, who had had between fourteen and fifteen years' experience as an electrical inspector, whose duties included the inspection of electrical installations, wiring, and attachments and fixtures tied to an electric line, was sent to the Garton property on the afternoon of July 11, 1950, the day on which Jeffers was killed, by the inspection bureau at Fike's request for an inspector. Having inspected the installations, and being a highly qualified witness, Perry gave graphic testimony as to the condition in regard to the electrical installations, which he found on the Garton property on the day the inspection was made. Arriving at the Garton home, he found the two switch boxes, that is the main switch box, and the gray switch box, heretofore referred to, in the wareroom at the far end of the store building. The main switch was on the wall at the end of the store building, where the Chesapeake Light and Power Company's main entry cable entered the building; and the gray switch box was diagonally across the wareroom on the partition wall between the wareroom and the Garton storeroom. Only the right fuse of the main switch was then in use. From the right fuse there emerged, through the lower right side of the main switch box, a nonmetallic cable, which carried electric current to the lights and other appliances in the Garton dwelling house and storeroom, other than the compressor and the beer cooler, installed by the distributing company, and the transformers and the electric controls on the gas floor furnaces, installed by the outfitting company. The installation for the compressor and the cooler was made by attaching to the line side on the main switch an armored cable, which emerged from the upper right side of the main switch box, and ran to the upper left side of the gray switch box, which latter switch had been installed on the partition wall of the wareroom a few feet above the compressor. On the other side of the partition wall

between the wareroom and the storeroom, the beer cooler was installed in the latter room, and a copper tube, which carried the gas refrigerant between the compressor and the cooler, was installed beneath the floor of the store-room and wareroom and underneath the partition wall. At the time of the inspection by Perry it was found that the copper tubing was electrically charged.

Perry described the main switch box as having attached to it, a "service conductor" and a "service protective ground wire", both at the bottom of the switch box; a black Romex cable, leading out of the main switch box on the right near the bottom, called a "branch circuit", and, as heretofore indicated, used for the purpose of furnishing electric service for lights in the Garton dwelling and store building, and for apparatus other than the equipment involved in this action; and a BX cable leading out of the upper right side of the main switch box, which, according to the witness, "Was supposed to have been a branch circuit", which cable was connected with the gray switch, and from there, by the use of the two fuses in the gray switch box, the current was carried by a BX cable, which emerged from the bottom of the gray switch box, to the compressor on the floor of the wareroom immediately below the gray switch box. Perry testified that the two fuses in the gray switch box were to protect the com-pressor circuits from overcurrent or overload, and if there was an overload or overcurrent or short circuit and the wire is "properly" connected, the fuses will burn out; but the way the Romex cable, evidently the cable leading to the transformers, was connected on the line side of the switch in the gray switch box, the fuse plugs would not be affected at all "Because the current wasn't passing through the fuses." Perry's inspection disclosed that the Romex cable, evidently meaning the cable installed by the outfitting company, led from the upper right side of the gray switch box to the transformers. Witness testified that because this cable was attached in the gray switch box on the line side of the switch, a short at any place in any of the wiring leading to the compressor or to the

furnaces would have no effect on the two fuses in the gray switch box. Perry's inspection further disclosed that the gray switch box was charged with electricity caused by a ground on a live wire somewhere on the extension to the circuit.

Perry testified that the wiring installed by the distributing company was not properly installed, so that a short therein would electrically energize the gray switch box, all of the metal parts in the compressor system, and the copper tubing. The witness further testified that there was a break in the armored cable between the two switch boxes, and if the armored cable had not been broken, there would have been a fire, "but with the armor broken, there was nothing to do but for the current to go from the ground that is in the box there or somewhere—I said somewhere in the circuit."

Plaintiff's witness, Otto Mundy, an electrical contractor, who had been engaged in electrical contracting work all over the State of West Virginia, and in some parts of Ohio and Kentucky, made an inspection at Fike's request of the electrical installations involved in this case; and found that except for the Romex cable emerging from the lower right side of the main switch box, servicing lights and appliances on the load side of the main switch, all the rest of the wiring he inspected concerned the compressor, the transformers and the furnaces; that the BX cable emerging from the upper right corner of the main switch box was the feeder to the gray switch box, which took care of the compressor and the furnaces, and was connected on the line side of the main switch, so that if the main switch was "pulled and open", the current would continue to come in on the cable leading to the gray switch box. At the time of the inspection this BX, or metallic, cable was broken, and witness found that the Romex, or black nonmetallic, cable, emerging from the right corner of the gray switch box, was on the line side of the switch in the gray switch box, and if that switch was "opened and off", the current would still go through the Romex

cable to the transformers. In this latter cable the witness discovered a ground in the gray switch box itself. This ground was caused by a sharp edge of the connector cutting into the black or lead wire of the cable, resulting in the electrical charging of the gray switch box, the compressor, the tubing, and everything metal connected therewith; but the break in the armor of the BX cable between the two switch boxes would serve to keep the charge from going back to the main switch box. Witness, over objection, testified in the negative to the inquiry, "Should any wire carrying current be carried around the load side of a main switch to the line side?"

On cross-examination Mundy testified that if the switch in the gray switch box "was thrown or were open", no electric current would go to the compressor, and that if the feeder cable, that is the Romex cable installed by the outfitting company, had not been installed, there would have been no short in the gray switch box.

Doran Frame, an experienced electrical contractor called on behalf of the distributing company, testified that he had inspected the electrical installations involved in this action on the day following decedent's electrocution, and that he found a ground of the type which is driven into the ground along side the Garton house, consisting of a wire attached to a metal stake. This witness testified that the ground had been broken, and if it had not been broken and the overcharge had gone into the ground "There wouldn't have been any charge on the refrigeration coils. It would have blown the fuse, or broken down the circuit", and that decedent would not have been killed; and further that if there was a short in the gray switch box and the "cable leading from this gray switch to the main switch had been wired to the ground side of the main switch, then a fuse would have been blown", and decedent would not have been killed.

A necessary implication from this witness's testimony is that if the gray switch box, which had been energized by the short in the Romex cable installed by the outfitting

company, had been served by a ground, that is either a ground wire on the main switch box running to the driven ground, or by an independent ground connection on the gray switch box, the BX cable running from the gray switch box to the compressor would not have been electrically energized, so as to cause the copper tubing between the compressor and the cooler to become electrically charged.

On direct examination Frame testified that normally an armor covered cable carries a ground, and that the splice in the armor of the BX cable between the two switches, resulting in a separation of the armor, caused the breaking of the "outside ground." The witness's testimony in this regard is confusing, in that it is not clear whether the witness was discussing the break in the armor of the BX cable between the two switches as being in addition to the break in the ground connection outside the building, because shortly before giving this testimony the witness was asked on direct examination: "What, if anything, had happened to that ground", to which he replied, "It had been broken." And then, more specifically, he was asked, "Now, Mr. Frame, was that the ground which was just on the upper side of the store building and adjacent to the fence", to which the witness answered, "Yes."

As the inspection of the driven ground was made by the witness Frame on the day after decedent was electrocuted, it may be important to note that Mrs. Garton testified that Fike's men, in raising the store building in an effort to move the same, broke the driven ground prior to decedent's electrocution.

A summary of the testimony of the witnesses, bearing on the condition of the two switch boxes, the main switch box on the inside of the end wall of the store building, and the gray switch box, installed by the distributing company above the compressor on the partition wall in the store building, furnishes the following description, which bears directly on the crucial question whether de-

cedent was electrocuted as the result of either or both of the defendants being guilty of negligence, which proximately caused decedent's death.

The main switch box, containing what may be designated as the main or master switch, is served by a large nonmetallic entry cable, leading into the bottom end of the box, and installed ahead of the fuses and main switch; to the left of this entry cable there is a small uninsulated ground cable leading from the bottom end of the main switch box to a point where a ground was established; a Romex cable, that is a cable containing a nonmetallic cover, leads from the load side of the main switch in the main switch box, that is the side of the switch where use is made of the electric current, through the right side of the main switch box, a short distance from the lower end thereof, and thence to outlets in the dwelling house and store, such as lights and appliances, which Romex cable is attached to only the right fuse of the two fuses in the main switch box, the left fuse being unconnected and unused; from the upper right corner of the main switch box, a BX cable, that is a metallic or armored cable, leads from the line side of the main switch in the main switch box, the line side of the switch being where the main or feeder line comes into the building, uncontrolled by the switch and fuses, across the storage room where the BX cable enters the gray switch box at the upper left side thereof; thence the electric current is served and controlled by the switch and fuses in the gray switch box; and then from the load side of the switch in the gray switch box a BX or metallic or armored cable, emerges from the bottom end of the gray switch box to the compressor immediately below on the floor of the wareroom.

From the line side of the switch in the gray switch box, and emerging from the upper right side of the box, is a Romex or nonmetallic insulated cable, which leads to the transformers, which in turn reduce the electric current suitable for the operation of the thermostats or gas regulators on the gas furnaces.

As heretofore stated, the gray switch box, including the switch and the two fuses therein, as well as the BX or metallic cable, one between the two switch boxes, and the other leading from the load side of the switch in the gray switch box to the compressor, were installed by the distributing company, and the Romex or nonmetallic cable, leading from the line side of the switch in the gray switch box to the transformers, was installed by the outfitting company.

From the foregoing description of the electrical installations made by the two defendants, respectively, it appears that if the main switch in the main switch box was pulled, the electric current would be cut off the lights and appliances in the dwelling and store building, other than the compressor, cooler, transformers and furnaces; and if the switch in the gray switch box was pulled or open the electric current, in the absence of a ground in that switch box, which would run normally to the compressor, if the switch was closed, would be cut off.

An inspection of the installations which the various witnesses made after decedent was electrocuted disclosed that the wiring on the BX or metallic cable, leading between the two switches was spliced, but at the point of splicing the armor of the cable was broken and separated.

The closing or opening in the main switch in the main switch box would not affect the flow of the electric current to the line side of the switch in the gray switch box, and if the switch in the gray switch box was closed, and there was no ground in that switch box, and no break in the armor of the BX cable, leading between the two switch boxes, the electric current would pass normally through the switch and fuses in the gray switch box, to the compressor, but whether the switch in the gray switch box was open or closed, the electric current would flow normally, in the absence of a ground, from the line side of the switch in the gray switch box, through the Romex or nonmetallic cable, installed by the outfitting company, to

the transformers, and thence to the thermostats or gas regulators on the gas furnaces.

The record contains credible evidence to the effect that there was a short or ground in the Romex or nonmetallic cable, installed by the outfitting company, within the gray switch box itself, at or near where the cable emerged from the gray switch box, and led to the transformers, which ground was caused by the cutting of the insulation of the cable by improper clamping of the cable, and served to "charge" the metallic parts of the gray switch box, the BX cable leading to the compressor, the compressor, the cooler, the copper tubing, between the compressor and the cooler, and the armor of the cable between the two switch boxes to the point where the armor was broken. The separation in the armor of the BX cable between the two switch boxes was caused by the distributing company having an insufficient single length of cable to cover the distance between the two switch boxes, so that the installation was made with two lesser lengths of cable, one being installed from the main switch box to the point where the wiring was spliced, and the other from the gray switch box to that point.

As the evidence bearing· on the pertinent factual questions raised by this record is credible and probative, it was within the province of the jury, in arriving at its verdict, to believe from a preponderance of the evidence adduced on behalf of the plaintiff and both defendants that decedent would not have been electrocuted by coming in contact with the electrically charged copper tubing running between the compressor and the cooler installed by the distributing company: (1) If the distributing company had not circumvented the unused left fuse in the main switch box, and had attached thereto the BX or metallic cable, leading from the main switch to the switch in the gray switch box; or (2) if, in the event, as the distributing company's evidence tends to show, sufficient power could not be obtained for the operation of the compressor by the use of the unused fuse in the main switch

box, the distributing company had substituted a larger fuse box and properly grounded the same; or (3) if the distributing company had installed an unbroken BX or metallic cable between the two switch boxes, the driven ground connected with the main switch box would have been utilized, provided that the ground had not been broken, as the distributing company's witness Doran Frame testified, and the charge, created by the short in the lead wire of the Romex cable installed by the outfitting company, which ultimately resulted in electrically energizing the copper tubing between the two switch boxes, would have been dissipated, and decedent would not have been electrocuted thereby; or (4) if the distributing company had adequately grounded the gray switch box by the use of a separate and independent ground; or (5) if the distributing company had informed the Gartons that it had attached the BX or metalilc or armored cable, leading from the main switch box to the gray switch box on the line side of the switch in the main switch box, so that the Gartons would have known that the opening or pulling of the main switch in the main switch box would not serve to cut the electric current flowing to the gray switch box, and then through the fuses and the switch in the gray switch box to the compressor.

Likewise the evidence portrayed by this record would have justified the jury in believing from a preponderance of the evidence that the decedent would not have been electrocuted: (1) If the outfitting company in its installation of the electrical apparatus required for servicing the transformers and the electric thermostats or gas regulators, which it had installed, had not circumvented the switches and fuses in both switch boxes, and in particular the unused fuse in the main switch box; or (2) if the outfitting company had substituted a larger and properly grounded switch box for the main switch box, or had installed a separate switch box, properly grounded and containing ample fuses; or (3) if the outfitting company had firmly installed the Romex or nonmetallic cable, leading from the line side of the switch in the gray switch

box to the transformers, and had used a proper connector or clamp, so that a short would not have been caused in the cable at or near the place where it emerged from the gray switch box; or (4) if the outfitting company had before making its electrical installations inspected both switch boxes, so as to become informed that the electric current running through the BX cable between the two switch boxes was attached in the main switch box on the line side of the main switch, so that the opening or pulling of the main switch would not serve to cut the electric current flowing into the gray switch box, and had so informed the Gartons.

The evidence in this case, bearing on the question whether either or both of the defendants was negligent in the foregoing particulars, which negligence concurred and was the proximate cause of decedent's death, is sufficient, in our opinion, to sustain the verdict in favor of plaintiff and against both defendants. In so holding, we are guided by the rule well established in our practice, which governs the appraisal of every verdict of a jury that: "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence." Pt. 1 syl., *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115. See also *State ex rel. Bumgarner* v. *Sims, Auditor,* 139 W. Va., 92 79 S. E. 2d 277; *Spence* v. *Browning Motor Freight Lines,* 138 W. Va. 748, 77 S. E. 2d 809; *Frampton* v. *Consolidated Bus Lines,* 134 W. Va. 815, 823, 62 S. E. 2d 126; *Laphew* v. *Consolidated Bus Lines,* 133 W. Va. 291, 294, 55 S. E. 2d 881; *Billy* v. *Powell,* 133 W. Va. 278, 282, 55 S. E. 2d 889; and *Boyce* v. *Black,* 123 W. Va. 234, pt. 1 syl., 15 S. E. 2d 588.

The very fact that the decedent was electrocuted by coming in contact with the copper tubing installed for the purpose of conducting refrigerant gas from the com-

pressor to the cooler, which was not designed for conducting electric current, shows beyond peradventure that decedent's death ensued as a result of some defect in the installation of the electrical installations. The fact that the distributing company installed in a defective manner the electrical apparatus required for servicing the compressor in 1948, and the outfitting company carelessly installed the electrical equipment for the purpose of servicing the thermostats or gas regulators on the furnaces in 1949, does not of itself render the negligent act of the distributing company a remote cause, and the act nearly a year later in 1949 of the outfitting company in installing its electrical equipment the proximate cause of decedent's death. We are aware that the definitions of "proximate cause" formulated by the courts are many and variant (see 34 Words and Phrases, Perm. Ed., 748, 749; Black's Law Dictionary, 4th Ed., 1391); but running through all the cases in this jurisdiction is the rationale that negligence of itself is not "actionable negligence", unless there is sufficient evidence from which the jury may find by a preponderance thereof that such negligence was the proximate cause of the injury or death. *Webb* v. *Sessler,* 135 W. Va. 341, 63 S. E. 2d 65; *Fleming* v. *McMillan,* 125 W. Va. 356, 26 S. E. 2d 8; *Donald* v. *Long Branch Coal Co.,* 86 W. Va. 249, 103 S. E. 55; and negligence to constitute the proximate cause of the injury or death of another must be such that injury or death could reasonably have been anticipated by an ordinarily prudent person. *State ex rel. Davis Trust Co.* v. *Sims,* 130 W. Va. 623, 46 S. E. 2d 90; *Fields* v. *Director General of Railroads,* 86 W. Va. 707, 104 S. E. 767.

Though this Court, in dealing with the question whether an alleged act of negligence is the sole proximate cause of the alleged wrongful death or injury complained of, has held that the proximate cause of an injury is the last negligent act contributing thereto without which such injury would not have occurred, *Schwartz* v. *Shull,* 45 W. Va. 405, 31 S. E. 914; *Divita* v. *Atlantic Trucking Co.,* 129 W. Va. 267, 40 S. E. 2d 324, it is settled in this jurisdiction

that where the alleged injury or wrongful death results from the concurrent negligence of two or more persons, though acting independently of each other, which combined resulted in the injury to or death of a third person, recovery may be had against either or all. *Starcher* v. *South Penn Oil Co.,* 81 W. Va. 587, 95 S. E. 28; *Day* v. *Louisville Coal & Coke Co.,* 60 W. Va. 27, 53 S. E. 776. And, more specifically, "Where separate and distinct negligent acts of two or more persons continue unbroken to the instant of an injury, contributing directly and immediately thereto and constituting the efficient cause thereof, such acts constitute the sole proximate cause of the injury." Pt. 1 syl., *Brewer* v. *Appalachian Constructors, Inc.,* 135 W. Va. 739, 65 S. E. 2d 87. Accordant: *American Telephone & Telegraph Co.* v. *Ohio Valley Sand Co.,* 131 W. Va. 736, 50 S. E. 2d 884; *Tawney* v. *Kirkhart,* 130 W. Va. 550, 44 S. E. 2d 634; *Gilkerson* v. *Baltimore and Ohio Railroad Co.,* 129 W. Va. 649, 41 S. E. 2d 188; *Sigmon* v. *Mundy,* 125 W. Va. 591, 25 S. E. 2d 636. See generally 65 C. J., Negligence, Section 110, and Restatement of Torts, Section 882.

In the instant case it may be said that the alleged negligent installation of the Romex cable in the gray switch box on the line side or ahead of the switch was the efficient cause of decedent's death, and in point of time was the last negligent act, without which decedent's death would not have ensued. Certainly, the jury was justified in finding, as it did by its verdict, that decedent's death was proximately caused by the alleged negligence of the outfitting company, which caused a short or ground in the wire, which, in turn, caused the electric current flowing through the various metal media to charge the copper tubing between the compressor and the cooler. But if, in the first instance, the BX cable had been installed by the distributing company in the main switch box so that it would be properly controlled by the switch therein and the unused left fuse, or if the armor of that cable had been unbroken, so as to permit the ground to the main switch box to function, provided the driven ground had not been broken, or a new fuse box properly grounded

had been installed, or the gray switch box had been grounded, or another main switch box, properly grounded, had been substituted for the main switch box, the copper tubing between the compressor and the cooler would not have been electrically charged, and decedent's contact therewith would not have resulted in his death, at least the jury could have so found.

In any event if the Gartons had been informed by either, or both, of the defendants that the opening or pulling of the main switch would not serve to cut off the gray switch box, when the decedent Jeffers and the four men under him were seen by John Garton and Mrs. Bess Garton as they arrived at the Garton property and proceeded to prepare for the moving of the store building; and by Gaylord Garton, son of the owners of the store building and dwelling, who had slept late and was getting up about the time the Fike movers arrived, in such event the Gartons could have warned decedent and those under him that the pulling of the main switch would not cut the electric current to the compressor and transformers. Gaylord Garton testified that he knew the main switch had been pulled because he noticed that his electric clock had stopped earlier in the morning. Mrs. Garton testified that she knew John Garton had pulled the switch, because of the effect it had on the electric current in the dwelling house, and John Garton said he pulled the switch in order to disconnect the feeder line from the porch box. These witnesses evidently thought that the pulling of the main switch would serve to protect the Fike movers, and evidently the movers assumed, at least they would have the right so to assume, that the Gartons would not stand by in silence and allow them to move a building in which electrical equipment and appliances were installed and operating without informing them of that situation. At least one of the movers saw John Garton on the porch "fooling" with the wiring on the store building, which of itself would indicate that somehow, at some time theretofore, a main switch controlling the main entry into the store building had been pulled.

From the foregoing we are of opinion that the evidence, bearing on the questions of negligence and proximate cause, is sufficient from which the jury could properly determine that the respective installations made by the distributing company and the outfitting company are negligent acts, which, though separate and distinct in themselves, continued by an unbroken sequence to the point of decedent's death, and, in the language in point 1 of the syllabus of *Brewer* v. *Appalachian Constructors, Inc., supra,* "contributing directly and immediately thereto and constituting the efficient cause thereof, such acts constitute the sole proximate cause of" decedent's death; unless, as set forth in point II of the brief filed by counsel for the outfitting company, the evidence established exclusively that the outfitting company's installation was tampered with by a third party, subsequent to the installation of its equipment and prior to the accident, so as to discharge any possible liability on the part of the outfitting company for decedent's death.

This postulate of defense is based upon the testimony of James W. Arthur, called as a witness in behalf of the outfitting company, who, after plaintiff's witnesses, Perry and Mundy, had testified that their examination of the electrical wiring shortly after decedent was electrocuted, showed that a short circuit or ground was present which energized the copper tubing, thus causing decedent's death, and after plaintiff had introduced evidence that the condition of the switch boxes, including the alleged defective connection to the transformers, which electrical equipment was exhibited to the jury at the trial, was unchanged from the time the equipment was taken from the Garton store immediately after decedent was electrocuted until the time of the trial, the gray switch box was opened in the presence of the jury and at the request of counsel for the outfitting company, which disclosed to the jury that the electric wiring composing the connection of the Romex cable, made by the outfitting company in the gray switch box, was completely severed.

After the opening of the gray switch box in the presence

of the jury had disclosed that the connection of the Romex cable, installed by the outfitting company, had been broken, defendants' witness, Max McDaniel, was recalled as a witness in behalf of the outfitting company, and testified concerning the Romex cable installed by the outfitting company that, "The main wire is broken in two"; and that under normal conditions the three furnace units, which witness had installed as an employee of the outfitting company, would not have operated with the wire "broken in two". Then plaintiff's witness, Gaylord Garton, on cross-examination testified that the furnaces had operated and had been used in the spring of 1950 immediately prior to decedent's death. After the furnaces had been installed, the outfitting company's employee, Max McDaniel, had cleaned the furnace burners in the fall of 1949, which was the last work done on the furnaces by the outfitting company; and in the fall of 1949, after the furnaces had been installed and the outfitting company had cleaned the gas burners, Gaylord Garton of his own volition disconnected the wiring on one of the furnaces, and took out a transformer installed in connection with that furnace. It is argued that this evidence establishes without dispute that at the time decedent was electrocuted the Romex cable installed by the outfitting company had been broken, and thereby a short was caused, and as the break in the wire was long after the outfitting company had done any work on the installation, counsel for the outfitting company assert that the "sole, direct and proximate cause of the accident was the act of some third party in breaking the wire." This, in all deference to able counsel who have made this assertion, is a *non sequitur*. Gaylord Garton in disconnecting the wiring on *one* of the furnaces was not working at or near the place where the Romex cable installed by the outfitting company was connected on the line side of the switch in the gray switch box, and while the exhibition of the open switch in the gray switch box to the jury disclosed that the wire had been completely severed, the gray switch box was opened in the presence of the jury long after

plaintiff's witnesses Perry and Mundy had inspected the electrical equipment at the Garton property, shortly after decedent was electrocuted, and their testimony is clearly to the effect that the Romex cable was not completely severed at or in the gray switch box, but a short was created by the breaking of the nonmetallic insulation and the exposure of the lead wire, which, coming in contact with the metal of the gray switch box, caused that box to become energized with electricity, which, through connected metallic media, energized the tube between the compressor and cooler, which in turn caused decedent to be electrocuted. The question posed by ground of error II in the outfitting company's brief is, in our opinion, simply one to be considered by the jury, along with the other evidence in the case, and enters into the question whether the defendants were guilty of actionable negligence, which, after all is said and done, is one for jury determination.

The respective relationships between the owners of the property, Kenton and Bess Garton, and the distributing company and the outfitting company present an interesting question, the solution of which is necessary to the decision of this case. That both the distributing company and the outfitting company were independent contractors appears clearly from this record. Each had contracted with the property owners the obligation to install in the Garton property its respective electrical apparatus, and the electrical equipment necessary for the operation thereof. Though the defendant distributing company contracted with the owners that it would install a compressor in the wareroom and a beer cooler in the storeroom, and the outfitting company contracted with the owners that it would install at specified places in the dwelling and in the store building three electrically regulated gas furnaces, there is nothing in this record to indicate that the owners had any right to control the defendants in their respective installations. If the owners had the right to control, as distinguished from the exercise thereof, the owners, as well as the defendants, would be liable under

the doctrine of *respondeat superior. Meyn* v. *Dulaney-Miller Auto Co.,* 118 W. Va. 545, pts. 1 and 2 syl., 191 S. E. 558. But as this record discloses that the installations were to be made by the defendants free from all control on the part of the owners, the defendants are independent contractors. In point 2 of the syllabus of *Meyn* v. *Dulaney-Miller Auto Co., supra,* this Court held: "The right to control, and not the exercise of control, is the test" of the relation between one having work done and the workmen doing the work. Restatement, 1 Agency, Section 2(3); *Rogers* v. *Boyers,* 114 W. Va., 107, syl., 170 S. E. 905; *Greaser* v. *Appaline Oil Co.,* 109 W. Va. 396, 155 S. E. 170.

On the basis that the defendants are independent contractors their counsel rely upon the general rule as stated in 27 Am. Jur., Independent Contractors, Section 55, that, "an independent contractor is not liable for injuries occurring to a third person after the contractor has completed the work and turned it over to the owner or employer and it has been accepted by him, even though the injury results from the contractor's failure properly to carry out his contract." On behalf of the defendant outfitting company it is asserted that the work contracted to be performed by it having been finished and accepted by the owner, the owner is substituted as the responsible party for any existing defects. The general rule thus providing for the substitution of liability where the work contracted for has been completed by the independent contractor and accepted by the contractee is supported by the great weight of authority. See the numerous cases cited under note 1, 27 Am. Jur., Independent Contractors, Section 55, and the recent annotation to *Hale* v. *Depaoli,* 33 Cal. 2d 228, 201 P. 2d 1, 13 A. L. R. 2d 183, anno. 191 to 252, inclusive.

There are, however, a number of exceptions to the general rule that an independent contractor's liability is substituted for that of the contractee where the work has been finished and accepted by the contractee. The several exceptions to the general rule are stated succinctly in 27

Am. Jur., Independent Contractors, Section 56, as: "(1) Where a manufacturer or vendor commits an act of negligence which is imminently dangerous to human life and health, in the preparation or sale of articles, such as foods and poisons, the primary use of which is to serve, destroy, or affect life and health; (2) where there is negligence on the part of an owner who expressly or impliedly invites third parties to use defective machines or instruments manufactured or furnished by him; (3) where a manufacturer or vendor, without giving notice of its character and qualities, supplies or delivers to another a machine or article which he knows to be imminently dangerous to the life and limbs of anyone who may use it for the purpose for which it is intended; (4) *where the manufacturer or constructor has full knowledge of the defects rendering the article or structure dangerous, but wilfully conceals the same;* and (5) where the article or structure is a nuisance per se, in which case negligence is immaterial. In other words, a right of action against an independent contractor for injuries to third persons from defects in completed works may be predicated upon the ground that the finished work is a nuisance, or that there has been fraud, misrepresentation, an implied warranty, or an implied invitation. *Furthermore, a contractor may be liable where he turns over work which is inherently or intrinsically dangerous, or, in other words, where the work is turned over in a manner so negligently defective as to be imminently dangerous to third persons, or where he knows of defective conditions of the work, which may not in itself be inherently dangerous;* and where he has knowledge that the article in question is to be used by the person subsequently injured." (Italics supplied). See also *Humphries* v. *Black Betsy Consolidated Coal Co.*, 115 W. Va. 768, pt. 1 syl., 178 S. E. 273, in which this Court quoted at page 772, evidently with approval, the rule stated in 14 R. C. L., page 107, that: "The general rule, however, is subject to some recognized limitations which continue the liability of the contractor even after he has parted with

his control over the work; as for instance, where the finished work is a nuisance, or where it is turned over by the contractor in a manner so negligently defective as to be imminently dangerous to third persons." See generally to the same effect *Clemens* v. *Benzinger*, 211 App. Div. 586, 207 N. Y. S. 539; *Colbert* v. *Holland Furnace Co.*, 241 Ill. App. 583, 164 N. E. 162; *Berg* v. *Otis Elevator Co.*, 64 Utah 518, 231 P. 832; *Sutton* v. *Otis Elevator Co.*, 68 Utah 85, 249 P. 437; *Smith* v. *St. Joseph R., Light, Heat & P. Co.*, 310 Mo. 469, 276 S. W. 607.

There is no evidence in this record that the Gartons had knowledge that the distributing company had wired around the main switch and to the line side thereof; and that the outfitting company had circumvented both the main switch and the switch in the gray switch box, and had wired to the line side of the latter switch; and certainly the Gartons had no knowledge, or means of knowledge, that the outfitting company had in the first instance installed the Romex cable leading to the transformers, in such an insecure manner that eventually a short would be created in the gray switch box. That it was improper to wire on the line side of an electric switch is established in this record by the great weight of the evidence; and if the installations by the defendants had been properly made there would, in the case of the outfitting company, have been no short in its Romex cable in the first instance, and in the case of both defendants the fuses would have blown and the circuit which led to decedent's electrocution would have been disconnected, or when the main switch was thrown the electric current would have been completely cut off and decedent's death would not have ensued. Under the facts portrayed by this record, we hold that the defendants, though independent contractors, have no defense in the independent contractor-contractee relationship. In this regard we adopt the rule stated in the italicized portions of the quotation from 27 Am. Jur., Section 56; and, more specifically, the language of the Supreme Court of Utah in the case of *Berg* v. *Otis Elevator Co., supra,* at page 525, that:

"As well settled and as potent as the rule itself are certain exceptions, one of which is that the contractor continues liable where the work is turned over by him in a manner so negligently defective as to be imminently dangerous to third persons. * * *

"The decided weight of authority supports the proposition that when an independent contractor has done work on an instrumentality and by his work makes the instrumentality imminently dangerous to those he knew would use it, he remains liable, even after the completion of his work and its acceptance by the contractee, to third parties injured as the result of his negligence if the contractor knew or in view of the peculiar circumstances of the case should have known the dangerous condition by him created, and the contractee had no knowledge of the dangerous condition or defect which was so concealed that reasonable inspection by the contractee would not have discovered it. * * *."

The outfitting company in its brief assigns as ground of error III the giving of plaintiff's instruction No. 1, asserting that the said instruction improperly invokes the doctrine of *res ipsa loquitur*. This instruction reads: "The Court further instructs the jury, if you believe from all the evidence in this case, plaintiff's decedent was killed as the result of coming in contact with a copper tube, which copper tube was charged with electricity as a result of an improperly installed beer cooler and compressor and gas floor furnaces and which were improperly wired and carrying electric current; and if you further believe from all the evidence in this case, that in ordinary and careful installation of such equipment, electricity is not found on copper tubes, part of such equipment, nor are the same charged with electric current, like that which killed the plaintiff's decedent, and if you further believe from all the evidence in this case, the defendants or either of them used improper care in the installation of such beer cooler and compressor and floor furnaces, which was the proximate cause of decedent's death, then the defendants are called upon to offer some reasonable explanation of the

occurrence, and if such explanation is not furnished, the circumstances itself may afford reasonable evidence that plaintiff's decedent was killed by the negligence of the defendants, and your verdict may be for the plaintiff." At the trial counsel for the distributing company and for the outfitting company, respectively, objected to the giving of this instruction on the broad ground that there is no evidence in the case which will support a finding that the electrical equipment was improperly or negligently installed. We, however, have heretofore in this opinion addressed ourselves to this question.

Counsel for the outfitting company assert specifically that the trial court erred in giving plaintiff's instruction No. 1 because (1) the instruction is based upon the doctrine of *res ipsa loquitur*, which doctrine is not applicable to the defendant outfitting company; and (2) the instruction ignores the defense of contributory negligence on the part of the decedent.

If plaintiff's instruction No. 1 invokes the doctrine of *res ipsa loquitur*, the giving of it would have been error, as the doctrine of *res ipsa loquitur* implies that the instrumentality, the negligent maintenance, operation or installation of which is alleged to have caused the injury complained of, was directly under the control of a defendant charged with liability on the basis of the doctrine, or through an agent or the defendant's agent or employee; and this record discloses that the defendants having completed their respective installations, whatever control the defendants had during the process of installing the equipment had ceased with the acceptance thereof by the Gartons. *Jankey* v. *Hope Natural Gas Co.,* 98 W. Va. 412, 127 S. E. 199; *Laurent* v. *United Fuel Gas Co.,* 101 W. Va. 499, 133 S. E. 116, pt. 1 syl.,; *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; and pt. 2 syl., *Pope* v. *Edward M. Rude Carrier Corporation,* 138 W. Va. 218, 75 S. E. 2d 584. In point 3 of the syllabus of *Bice* v. *Wheeling Electric Co.,* 62 W. Va. 685, 686, 59 S. E. 626, the doctrine of *res ipsa loquitur* is stated: "Where the agency causing an injury

is under the management and control of the defendant, and the injury is such as in the ordinary course of things does not occur if those having such management and control use proper care, it affords reasonable evidence, in absence of explanation by the defendant, that the injury resulted from negligence, and the rule of *res ipsa loquitur* applies."

Plaintiff's instruction No. 1 presents to the jury the factual question of proved negligence, as distinguished from the inference of negligence that the jury may draw on the basis of the doctrine of *res ipsa loquitur*. The instruction expressly told the jury that "if you believe from all the evidence in this case, plaintiff's decedent was killed as the result of coming in contact with a copper tube, which copper tube was charged with electricity", as a result of the improper installation of the beer cooler, the compressor and the gas floor furnaces, and that "if you further believe from all the evidence in this case, the defendants or either of them used improper care in the installation of such beer cooler and compressor and floor furnaces, which was the proximate cause of decedent's death, then the defendants are called upon to offer some reasonable explanation of the occurrence, and if such explanation is not furnished, the circumstances itself may afford reasonable evidence that plaintiff's decedent was killed by the negligence of the defendants, and your verdict may be for the plaintiff." The last-quoted part of the instruction is inaptly included in the instruction. Its inclusion, however, does not render the instruction prejudicial error, because it favors the defendants more than the plaintiff. We say this for the reason that the instruction tells the jury that if it further believes from all the evidence that "the defendants or either of them used improper care in the installation of such beer cooler and compressor and floor furnaces, which was the proximate cause of decedent's death", the jury may draw or not draw an inference of negligence based upon the absence of a reasonable explanation of the occurrence; whereas upon the hypothesis as to the jury's belief stated in plaintiff's

instruction No. 1, the plaintiff would be entitled to a verdict in his favor.

The second ground of error assigned by the outfitting company in its brief to the giving of plaintiff's instruction No. 1 is that the instruction ignores the defense of contributory negligence on the part of the decedent. This ground of objection is without substantial merit, for the reason that this record does not contain any probative evidence from which the jury could find that plaintiff's decedent was guilty of contributory negligence, which contributed to his death. When decedent arrived at the Garton premises, John Garton was in plain view of decedent, disconnecting the feeder wire on the porch of the store. This of itself would permit decedent to believe that the main switch had been pulled, which served to cut off the electric current; and, even if decedent did not entertain such belief, he could not by any stretch of imagination be deemed to have been guilty of contributory negligence in coming in contact, as he was required to do as disclosed by the testimony of plaintiff's witness, R. E. Perry, an electrical inspector employed by the West Virginia Inspection Bureau, for the reason that it would be apparent to decedent, and for that matter to any one else who observed the copper tubing running between the compressor and the cooler, that the tubing was designed to carry refrigerant gas, and, therefore, in the ordinary course of events would not be electrically charged. The rule, therefore, stated in point 5 of the syllabus of *Skaff* v. *Dodd,* 130 W. Va. 549, 44 S. E. 2d 421, and the cases cited in that point of the syllabus of the *Skaff* case, is inapplicable.

The outfitting company assigns as error the trial court's refusal to give defendants' instructions Nos. 6 and 7 (as amended), and the distributing company assigns as error the trial court's refusal to give defendants' instructions Nos. 6 and 7 (as amended), and 8.

Defendants' instruction No. 6 instructed the jury that after defendants' equipment had been installed, the installations became the property of the Gartons, and thereafter

there was no duty upon the defendants, or either of them, to keep "said equipment in good repair other than as may have been required under such warranties as may have been contracted at the time of sale"; and that the defendants were not liable for any condition or hazard which may have developed "after the respective installations and which may have contributed to the death of Roy Jeffers." The vice in the instruction is that the instruction ignores the exceptions to the general rule that an independent contractor is not liable for the injury to or death of a third party, after the work contracted for has been completed and turned over to the owner or contractee, and accepted by him, though the injury results from the contractor's failure to carry out his contract properly, which exception has been heretofore stated. See generally 27 Am. Jur., Independent Contractors, Section 56, heretofore cited in this opinion. And as the record discloses that the decedent's death, if it was the result of wrongdoing on the part of anyone, was caused by the original installations in an improper manner by the defendants of their respective electrical installations, and not by reason of "any condition or hazard which may have developed after the [defendants'] respective installations", the instruction is inapplicable to this case.

Though the short in the Romex cable installed by the outfitting company evidently occurred after the original installation, decedent would not have been electrocuted as a result thereof, if the installations by the defendants had not been improperly and negligently made. It was the inadequacy of the defendant outfitting company's installation in the first instance of the Romex cable, leading from the gray switch box to the transformers, which created the short, and also in the first instance it was the inadequacy of the defendants' respective installations to take care of the short created by the pinching or cutting of the outfitting company's Romex cable, which, under our holding, the jury could have found, as it did by its verdict, was the proximate cause of decedent's death.

The trial court, in our opinion, did not err in refusing to give defendants' instruction No. 7, as amended. This instruction told the jury that they should find for the defendants, if the jury should believe "that the destruction of said ground wire [the driven ground wire along side of the Garton house] was the proximate cause of the death of the deceased." This instruction ignores the postulate that, under our holding, the jury may find that the negligence and carelessness of the defendants in making their respective installations on the Garton property was the proximate cause of decedent's death. It was, as heretofore indicated, the inadequacy of defendants' respective installations in the first instance which caused the gray switch box, the BX cable between the two switch boxes to the point where the armor of the cable was severed, the BX cable, leading from the load side of the switch and fuses in the gray switch box, to the compressor, and metal parts of the compressor itself, and the copper tubing to be charged, and was the efficient and proximate cause of decedent's death. As at the time Fike's men had broken the driven ground, the ground had in the first instance been rendered useless to serve the gray switch box by reason of the negligent act of the distributing company in installing the BX cable between the two switch boxes, the armor of which cable was broken, the breaking of the driven ground by Fike's men could not be the proximate or a contributing cause of decedent's death.

Finally, we are of the opinion that the trial court did not err, as defendant distributing company asserts, in refusing to give defendants' instruction No. 8. This instruction is so framed that it told the jury that once the compressor, the beer cooler, and the copper tubing had been installed, it was unforeseeable that it would be necessary to service the equipment installed by the distributing company, and in particular the copper tubing itself. It is to be noted that Doran Frame, the distributing company's witness, testified that on making a service call to the Garton property, it became necessary for him, as he did, to use the language contained in defendants' instruc-

tion No. 8, "crawl under the store building in question and come in contact with the copper tubing in question." As held in point 4 of the syllabus of *Matthews* v. *Cumberland & Allegheny Gas Co.*, 138 W. Va. 639, 77 S. E. 2d 180: "One requisite of proximate cause is an act or an omission which a person of ordinary prudence could reasonably foresee might naturally or probably produce an injury, * * *."

For the foregoing reasons the judgment of the Circuit Court of Kanawha County in refusing as plainly right a writ of error to the judgment of the Court of Common Pleas of Kanawha County, and the judgment of the Court of Common Pleas of Kanawha County, based on the verdict of the jury, are affirmed.

*Affirmed.*