WEBB, JUDGE:
Claimants brought this action for permanent physical injuries, loss of consortium, and property damage sustained when a vehicle being driven by claimant Nancy Collins collided with a concrete barrier erected at a bridge construction site while she was traveling southbound on State Route 65 in North Matewan, Mingo County. At this location, State Route 65 is maintained by respondent. The Court will make an award for the reasons more fully set forth below.
FACTS OF THE CLAIM
The incident giving rise to this claim occurred on May 31, 1998, at approximately 9:15 p.m. On the day in question, claimant Nancy C. Collins was driving a 1988 Chevrolet S-10 pickup truck. The vehicle was owned by her husband Alfred E. Collins. Mrs. Collins was traveling southbound on State Route 65 in *310 North Matewan, Mingo County. According to Mrs. Collins, she was traveling at “no more than twenty-five miles per hour.” The posted speed limit was forty-five miles per hour. It was a dark and rainy night. The roadway surface was wet. The bridge at issue in this claim is commonly referred to as the Red Jacket Bridge, and it is located in North Matewan. State Route 65 runs north and south across the Red Jacket Bridge. Mrs. Collins routinely traveled this portion of highway. She traveled north on State Route 65 and crossed the Red Jacket Bridge to get to her place of employment, Mate Creek Mining Company, Inc., which is located in Red Jacket. Mrs. Collins had worked for Mate Creek Mining Company, Inc., for the previous six years, and she averaged working five days a week .
Red Jacket Bridge was under construction at the time of this incident. Construction began on May 26, 1998, and the bridge was completely closed to traffic going both directions. The respondent set up a detour around the construction site just north of Matewan. The detour then crossed over a small creek, curved hack to the right to by-pass the construction on the Red Jacket Bridge, and ended on the south side of the bridge where traffic was directed back onto State Route 65 on the opposite side of Akers’ Supply Company, Inc. The bridge was blocked off with four barriers on both ends. These barriers were concrete and were similar or identical to the type of concrete barriers used to divide an interstate highway.
Sometime between approximately 5:30 p.m. and 6:00 p.m. on Sunday, May 31, 1998, claimant Nancy Collins went to work. She traveled Route 65 north to Red Jacket, as she routinely did, to get to Mate Creek Mining Company, Inc. The visibility at this time was good. Mrs. Collins testified that as she approached the detour at the construction site, which would have been the south end of the Red Jacket Bridge, all she saw was “a piece of large equipment setting in front of the bridge in the road, that side of the bridge (the south end of the bridge ) in front of the bridge.” Mrs. Collins testified that she knew that the bridge was closed on the south end. She had traveled that very same route on four separate days during the previous week. Mrs. Collins got off work at approximately 9:00 p.m. and proceeded to travel back to her home in Matewan. She was traveling south on State Route 65 when she drove around a curve and came upon a small straight stretch just before the Red Jacket Bridge. As she approached the Red Jacket Bridge, two of the four concrete barriers were opened up, giving her the impression that southbound traffic was being directed through the barriers. Previously these barriers on both sides of the bridge were placed upright, side by side, blocking access to the bridge. Mrs. Collins testified that on one of the open barriers there was a “ red fluorescent type arrow ”. She testified that she thought this arrow was directing her to travel between the barriers and then across the Red Jacket Bridge.
As she started to drive between the two open barriers, her vehicle suddenly struck another concrete barrier that was knocked over on its side. She stated that she did not see this barrier due to the darkness and the rain. Her vehicle struck the *311 barrier resulting in a violent impact of her vehicle with the barrier when the vehicle came to a dead stop.
Claimant states that upon striking the barrier, the impact threw her forward and her head struck the windshield, causing the windshield to shatter. She described the impact as violent. It jerked her backwards and forwards, knocking her head into the side window. After the vehicle came to a stop, claimant took her seatbelt off and quickly exited the truck. Local residents came to assist. She went inside one of their homes and someone called the police for help. Sergeant Scott Wigal of the West Virginia State Police responded to the scene of this accident to conduct a formal investigation.
Claimant did not go to the hospital on the night of this incident; however, she was in serious pain the day following the accident so she had her husband, claimant Alfred Collins, drive her to the emergency room at Williamson Memorial Hospital where she was treated and released. The claimant was instructed to follow up with another physician upon release. She then sought treatment from Dr. Lura Beth Williams, a Doctor of Chiropractic, located in South Williamson, Kentucky.
Claimants assert that respondent negligently placed barriers at the bridge site; that it negligently failed to illuminate the bridge; and that it failed to place the proper warning signs and/or signals in place for the southbound traffic. Claimant Nancy Collins asserts that respondent’s negligence has caused her serious injuries including injuries to her neck, mid back, low back, and hip. She is seeking an award for past medical expenses, economic loss both past and future, and pain and suffering. Claimants A Ifred E. C ollins a nd Na ncy C. C ollins h ave b een m arried seventeen years. Alfred Collins seeks an award for loss of consortium due to his wife’s injuries. He asserts that his wife’s injuries have negatively affected their marital relationship. He also seeks an award for damages to his truck in the amount of $2,800.00.
Respondent’s position is that Nancy Collins was or should have been aware of the on-going construction project at the Red Jacket Bridge and that the bridge was closed. Further, she could and should have avoided the barriers completely by simply using the detour. The project to repair the Red Jacket Bridge began on Tuesday, May 26, 1998. Respondent argues that since claimant traveled this same portion of road to and from work on May 26, May 27th, May 28th, and finally on her way to work on the evening of the incident, Sunday, May 31, that she knew or should have known the bridge was closed. Respondent argues, since claimant knew that the northbound portion of the bridge was closed as she traveled to her job at approximately 5:30 p.m. on May 31, she should have also known that the southbound portion of the bridge was closed as well. Respondent also contends that if there were any problems with warning signs or the placement of the barriers, it did not have notice of these problems until after claimant’s accident on May 31, 1998.
*312 Sergeant Scott Wigal was the Assistant Detachment Commander in Mingo County at the time of this incident. Sergeant Wigal arrived at the scene at 9:35 p.m., shortly after the incident. He testified that although he vaguely remembers being at the scene of this accident near Red Jacket, he did not have any specific recollection of the details other than the information provided in the Uniform Traffic Accident Report which he completed on May 31, 1998. Sergeant Wigal took Mrs. Collins’ statement at the scene. He noted in his report that Mrs. Collins did have both her lap and shoulder harness belts on at the time of the incident. He also noted the weather and road conditions at the time of the accident. Specifically, he noted that it was dark, rainy, and that visibility was obscured by the rain. In addition, the black top road surface was wet. Sergeant Wigal concluded that Mrs. Collins “Failed to Maintain Control” of her vehicle and that her vehicle collided with a concrete barrier in the roadway. He testified that it was his opinion that claimant’s failure to maintain control of her vehicle was a contributing cause to this incident. He did not cite the claimant with any improper driving nor did he conclude that she was speeding or driving too fast given the circumstances. When questioned to clarify his finding that claimant failed to maintain control of her vehicle, he responded that based upon his training at the academy, a driver has a responsibility to avoid colliding with “normal things like road construction equipment and barriers and so forth.”
Sergeant Wigal’s testimony regarding the signs at or near the scene also was based upon the notes he made in the Uniform Traffic Accident Report. He stated that he had no direct memory of it, but, referring to the accident report, he noted that there was a detour sign north of the concrete barriers and a bridge closed sigh just south of the concrete barriers in the vicinity of the accident vehicle. Sergeant Wigal indicated in his report that the “Bridge Closed” sign was lying on the roadway near claimant’s vehicle. He also testified that there was a detour sign north of the concrete barriers, but he did not recall any other detour signs, bridge closed signs, or other warning devices, including flashing lights and he did not indicate any being present at the scene in his report. Sergeant Wigal admitted that if there had been any other signs, flashing lights, or red flags, he probably would have indicated such in his report. He also agreed that since his report made no mention of any illumation on the side of the bridge which claimant struck, it was safe to conclude that there was no such illumination. It was his opinion that the vehicle had struck two concrete barriers and then came to rest in between the two barriers. However, he did admit after reviewing photographs of the vehicular damage submitted in evidence that this evidence did raise some questions as to whether or not claimant may have struck a third barrier which had been lying in the roadway on its side and that this would be consistent with the damage to claimant’s vehicle.
An owner of a business adjacent to the accident site, David B. Akers, testified about the scene of this incident as well as testifying regarding the number of accidents at this location, both prior to and after claimant’s incident. Mr. Akers *313 described the detour scene. He stated that there were four concrete barriers at each end of the bridge which were lined up side by side in a straight line so as to completely block traffic from crossing the bridge. These barriers were approximately thirty-six to forty inches high. However, the barriers were not locked together nor were they anchored to the ground. Mr. Akers testified that these barriers were struck numerous times by other vehicles. He testified that there were approximately ten accidents involving vehicles colliding with these barriers within the first week to ten days of this project. Although he never saw any vehicles strike the barriers, he heard many of the collisions and he assisted drivers whose vehicles had struck the barriers or whose vehicles got stuck on the barriers. Mr. Akers and some of his employees would use Akers’ heavy equipment to assist respondent’s bridge crew in replacing-the barriers.
Mr. Akers also testified that these barriers had arrows painted on them with a fluorescent orange or red-like color that directed the southbound traffic to veer to the 1 eft t o e nter t he de tour. He stated t hat t here w ere n ot a ny s igns, s ignals, o r directions other than the arrows painted on the barriers, indicating to the traffic that it had a left detour ahead. It was his opinion that this was one of the main reasons why so many vehicles collided with these barriers. He described how drivers traveling south on State Route 65 would come upon this detour suddenly and without adequate warning. Furthermore, the detour sign referred to in the accident report is approximately a quarter mile north of the project. He does not recall any other signs between this detour sign and the bridge. In his opinion, many drivers did not realize that there was a detour, and their vehicles would clip the barriers and knock some of them over. He also testified that when these barriers were hit and turned sideways, “it would have been pretty likely that a car could have went through there.”
David McCoy also testified regarding the nature of this construction site, and as to the number of accidents involving v ehicles s lamming into the concrete barriers. David McCoy’s home is adjacent to the Red Jacket bridge. The front of David McCoy’s home is approximately thirty-five to forty feet from the nearest barrier. He heard many vehicles collide with the concrete barriers, and he would see the damage to the barriers and how much they had been moved around as a result of these collisions. He helped people who had just struck the barriers to make sure they were all right, and he also assisted the employees from Akers’ Supply in placing the barriers back into position so as to prevent anyone else from striking them. Mr. McCoy also testified that most of the collisions occurred at dark or just before dark. He explained during his testimony that his son had driven his vehicle into the same concrete barriers that the claimant drove into. He testified that his son’s vehicle collided with these barriers at “a high rate of speed either on May 29 or May 30, 1998.” This collision displaced the barriers, and, according to David McCoy’s, testimony, the barriers were not replaced or moved back into position so as to fully block the bridge. As far as warning signs are concerned, David McCoy testified that *314 there was a “Bridge Closed” sign that was set up on something like a tripod brace. He testified that the sign did not always stay up throughout the bridge construction. It was knocked over “routinely” by people and the wind would even blow it down. He had to pick the sign up on at least four different occasions and set it back up.
Respondent asserts that it was in total compliance with the Federal Traffic Control Manual for Street and Highway Construction and Maintenance Operations, adopted by the West Virginia Division of Highways in 1994. Specifically, the respondent was referring to C ase Al 2 of the Manual. The respondent presented testimony through Edwin Layman, who is the Transportation Services Supervisor for District II, regarding the requirements of the Case A12 and its application in this case. Mr. Layman testified that he was responsible for having the proper signs in place at the construction project in accordance with the provisions of the manual. He sent his crew to set up the signs at this project and he went to the project shortly afterwards and field checked what had been done on May 27, 1998. Mr. Layman testified that when a project falls under the specifications of this manual, then it must be used, and all specifications must be followed. He also testified that he took a copy of the Case A12 diagram and slowly drove through the project to make sure that each sign that was required to be in place according to the manual was actually in place.
ANALYSIS AND CONCLUSIONS OF LAW
The well established principle of law in the State of West Virginia is that the State is neither an insurer nor a guarantor of the safety of travelers upon its roads. Adkins v. Sims, 130 W.Va.645; 46 S.E.2d 81 (1947). However, the State does have a duty to exercise reasonable care and diligence in the maintenance of its highways under all circumstances. Adams vs. Dept. of Highways, 14 Ct. Cl. 214 (1982); Hobbs vs. Dept. of Highways 13 Ct. Cl. 27 (1979). In order to hold the respondent liable for road defects of this type, a claimant must prove that respondent had actual or constructive n otice o f t he de feet and a r easonable t ime tot ake c orrective a ction. Chapman vs. Dept. of Highways, 16 Ct. Cl. 103 (1986). Finally, to be actionable, negligence must be the proximate cause of the claimant's injuries. Louk vs. Isuzu Motors, Inc. 198 W.Va. 250; 479 S.E.2d 911 (1996); Roush v. Johnson, 139 W.Va. 607, 80 S.E.2d 857 (1954).
The first issue in this claim is whether or not the respondent had the proper signs in place to provide adequate notice to drivers that the Red Jacket Bridge remained closed to southbound traffic on Route 65. Second, if respondent did have the proper warning signs in place, were these placed in a proper, secure manner and in proper working condition. Given the testimony presented at the hearing of this matter, it is this Court’s opinion that respondent did not fulfill its obligations to the claimant herein.
A review of the testimony from various witnesses familiar with this scene and State Route 65 establishes that there was inadequate warning to the southbound traffic of the approaching detour. It is evident that the “bridge closed” sign was not *315 properly placed nor secured, so as to give motorists warning that there was a detour and that the Red Jacket Bridge remained closed.
The lack of signs or notice of the detour created a hazardous situation for drivers approaching the Red Jacket Bridge from the north. Unfortunately, an already dangerous situation was made worse by the improper placement and use of the concrete barriers which were used primarily to block the entrance to the bridge, but they also were used to channel the traffic through the detour with the use of the painted orange arrows. Testimony adduced from numerous witnesses leads the Court to conclude that the lack of proper signs and the improper use of and placement of the concrete barriers created what was in essence a trap for unsuspecting motorists, especially for those motorists traveling at night. There was insufficient illumination on the bridge and the barriers. There is also undisputed testimony that these barriers had arrows painted on them with an orange fluorescent-type paint. The lack of warning signs, along with the lack of adequate illumination, apparently made it very difficult for drivers to see that there was a detour and that they were approaching a concrete barrier.
The Court is of the opinion that it was foreseeable that a driver approaching the Red Jacket Bridge and observing the barriers inadvertently could drive through the barriers and have a collision. The fact that the barriers were not secured together or anchored in some way so that no separation could occur if the barriers were moved by traffic allowed the barrier with an arrow on it to move in such a way as to create a trap for an unsuspecting driver. The evidence adduced at the hearing, especially the photographs of the damage to the vehicle, indicate that Mrs. Collins did in fact have enough room to maneuver her truck between the two open barriers to cross what she thought was the Red Jacket Bridge and then strike a barrier knocked over on its side. The photographs of the vehicle Mrs. Collins was driving clearly show that she did not simply crash into two upright barriers. The photographs of the damage to her vehicle are consistent with her version of the accident as the damage was limited to the lower left portion of the vehicle. Officer Wigal also testified that whatever impacted the truck hit it at a height of approximately eighteen inches, which is much more consistent with striking a barrier turned over on its side than one standing upright. This evidence leads the Court to the conclusion that there was enough room for Mrs. Collins to maneuver her vehicle through the two barriers where it struck the barrier which was already knocked over on its side. Thus, there was a combination of negligent acts and omissions on the part of the respondent that constitutes the proximate cause of this accident.
However, the Court is also of the opinion that Mrs. Collins was twenty percent at fault in this incident. The evidence adduced at this hearing also established that Mrs. Collins was familiar with State Route 65. She was aware that the Red Jacket Bridge was under construction as of May 26, 1998, and that it was closed to both northbound and southbound traffic. She also passed the construction *316 site as she traveled through the detour three different times to and from work prior to the night of the accident. On the date of the accident May 31, 1998, Mrs. Collins passed the Red Jacket Bridge while driving north to her place of employment. Given the fact that she knew that the bridge ha d been totally blocked to traffic in both directions as she came home from work on May 26, May 27, and May 28, she should have been more cautious as she returned home from work on May 31, 1998. Although the respondent did not have adequate signs in place, and was negligent in the use and placement of the concrete barriers, she should have traveled at a slower rate of speed than that at which she was traveling. Therefore, the issue of the adequacy of signs at the scene is negated by the fact that Mrs. Collins had driven through the area several times prior to the night of her accident. However, the Court is of the opinion that if she had been traveling at a slower rate of speed, she may have been able to avoid the dangerous trap that awaited her, or at least reduced her damages. The Court concludes that claimant Nancy C. Collins be assessed twenty percent for her comparative negligence.
DAMAGES
Claimant Nancy Collins suffered serious physical injuries as a result of this incident. She testified to the Court that she is in constant pain. She has a great deal of pain including headaches, neck pain, mid-back pain, low-back pain, and pain in her right hip. Mrs. Collins also had a noticeable limp due to the injury to her right hip. Dr. Lura Beth Williams, D.C., treated Mrs. Collins for approximately five months. She ran numerous diagnostic tests including physical exams, x-rays, ultrasounds, and a CPT current perception threshold, which is a nerve study. Dr. Williams diagnosed Mrs. Collins as having sub-acute cervical strain and localized edema and scarring in this same region. This has resulted in diminished movement and function of the muscles in the cervical region. Dr. Williams also diagnosed her with lumbar strain, edema, and scarring. Also, there are some arthritic changes to the facets in the lumbar region.
Mrs. Collins also suffers from a limp on her right side due to a s erious sprain, strain, and muscle compensation to her hip. Dr. Williams testified that Mrs. Collins is “antalgic” meaning that she is unable to stand erect. She also lacks range of motion in her hip demonstrating significant trauma to this area. Mrs. Collins also suffers from a leg length discrepancy due to the injuries to her leg and hip muscles.
Dr. Williams treated Mrs. Collins by applying adjustments to her injured areas along with other conservative treatment. When Dr. Williams was not able to treat Mrs. Collins to a state at or near her pre-accident physical condition, she recommended cessation of the treatment.
Claimant a Iso w as t reated b y D r. P anos Ignatiadis, a n eurosurgeon, w ho performed an MRI on Mrs. Collins. He did not find any need at that time for surgical intervention. Mrs. Collins had a second MRI in January 2001 at the request of her family physician, Dr. Camomot. This MRI was performed on her cervical spine, her *317 right hip, and her proximal femur. The findings were as follows: degenerative disc disease from levels C3 through C7; obliteration of the spinal foramina at C4-C5; and at C5-C6. Finally, Mrs. Collins also suffers from osteoarthritic changes in her hips.
These injuries have caused Mrs. Collins a great deal of pain and suffering, loss of enjoyment of life, and depression. She is unable to perform those duties around the home that she formerly was able to do. She requires the help of her husband to get through her daily life. It is difficult for her to bathe, cook, and clean house due to the pain. She is now on anti-depression medication as a result of her injuries. She is no longer able to work due to her injuries and she has been declared disabled. She receives disability from the Social Security Administration.
Both Mr. and Mrs. Collins testified that this incident has had a very negative effect on their marriage. Mr. Collins testified that his wife is not as happy or as active as she was before this incident. This incident has also had a dramatic effect on the claimants’ personal and intimate relations as well. The Court is of the opinion that claimant Alfred E. Collins has suffered a loss of consortium as a result of the injuries t o h is w ife a nd t he 1 oss o f h is t ruck. Therefore, t he C ourt f inds t hat t he claimant Alfred E. Collins is entitled to an award of $7,800.00. The Court also finds that claimant Nancy C. Collins is entitled to an award of $96,000.00 which amount is reduced by the assessment of comparative negligence for a total award of $76,800.00.
In accordance with the finding of facts and conclusions of law as stated herein above, the Court makes an award in the amount of $76,800.00 to claimant Nancy C. Collins and an award in the amount of $7,800.00 to claimant Alfred E. Collins.
Award of $76,800.00 to Nancy C. Collins.
Award of $7,800.00 to Alfred E. Collins.