WEBB, JUDGE:
Claimant brought this action for property damage to her home located in Dunbar, Kanawha County, which she alleges occurred during a construction project on 1-64 in October 2000. Claimant alleges that her home sustained the most serious damage on one particular day in October 2000. Respondent is responsible for the maintenance of 1-64 in Kanawha County. The Court is of the opinion to deny this claim for the reasons set forth more fully below.
Claimant, Pearl Watts, a 72-year-old widow resides at her home in Dunbar. Claimant’s home fronts Route 25, also referred to as Fairlawn Avenue. It is a single story home made of masonry block. The left side of the house is an addition and is constructed over a crawl space while the right side is part of the original home and is constructed over a basement. There are three covered porches on the front, left, and rear sides. The house has three bedrooms. It is located approximately seventy-five to one hundred yards from 1-64, which is located on the other side of Route 25 and above claimant’s home. Claimant purchased her home in 1976 and has lived there ever since. At the time this incident occurred, the exterior of her home was made of stucco, but sometime in the summer of 2001, cl aimant had vinyl siding install ed in place of the stucco. During this time period, she has made normal routine maintenance repairs to her home. Claimant installed a drainage system in the basement of her home and a sump pump approximately fifteen or sixteen years prior to 2002, when this claim was heard. Claimant had the sump pump installed due to concerns of potential water damage in the basement. She had some exterior patching done to her home approximately fifteen or sixteen years ago. Claimant also stated that she recalls having some minor cracking problems on the front portion of her home in the early to mid 1980's. However, she stated that she had it repaired and she has not had any trouble since then until this incident. She stated that she had her basement water proofed in 1990, and the gutters replaced in the mid 1980's. However, most work performed on her home was to ensure that it would remain in good condition. Beginning in 1999, respondent was in the process of an on-going construction proj ect on 1-64 to add a third lane in both directions of the interstate and to install a new permanent concrete barrier. Heavy equipment was being used on a daily basis, and Jersey barriers were placed to provide lane separation during various stages of the construction project. She testified that she had not experienced any problems regarding cracking of the walls or other foundational problems until the incident at issue in this claim. Although claimant could not see the construction work from her home, she saw it often while driving on the interstate. One night in late October 2000, claimant felt extremely strong vibrations and heai'd loud noises coming from the construction area on 1-64. She testified that the doors and windows on her house shook and rattled. She could feel her home vibrating. The next morning she awoke and attempted to exit her home through the front door facing I-64 but was unable to do so because it was jammed. She was also unable to open the door at the east end of the house, which was also j ammed. The only door in the house that she was able to open was the sliding glass door located at the back of the house. She *17 telephoned her brother-in-law, Freer Oxley, to come and assist her with opening the two doors which she was unable to open. In addition, outside of the house there are numerous cracks over the windows and around the doors including the living room window as well as a large crack in the wall of the back porch. Claimant also stated that the porch on the left side of the house was pulled loose from the house due to the vibrations. The outside wall above the door leading from this porch to the utility room also has a significant crack above it which extends from the comer of the door to the roof above the porch. The down spout gutter was broken loose from the right front comer of the northern end of the house and there is a large, deep crack in the external wall of the right rear comer of the house. Claimant testified that the down spout was significantly displaced from the gutter. She also testified that this occurred on the same night in October 2000 that she felt strong vibrations and heard loud noises. She stated that she had not had any problems with her gutter or down spouts coming loose or displaced prior to this event. Claimant introduced photographs into evidence demonstrating most of these damages including the door in the laundry room which has “dropped down” and cannot be opened without pulling the door facing loose. Claimant also submitted photographs into evidence showing cracked plaster above the windows in all three bedrooms of the house. Some areas were significantly cracked and damaged. She has attempted to repair these cracks but has beenunsuccessful in doing so. Furthermore, claimant testified that there is significant cracking of the concrete or cinder blocks that make up the foundation of the front comer of her home. Additional photographs introduced by claimant show several large cracks extending horizontally through and along the mortar lines of these blocks. Claimant also testified that there is some cracking of the concrete or cement blocks in the crawl space under the front portion of her home.
Alexander Brast Thomas, a certified civil engineer with the Thomas Company, testified as claimant’s expert in this claim. Mr. Thomas visited claimant’s home and spoke to her regarding the incident and the subsequent damages. He reviewed the report prepared by Mr. Pennington of Civil Tech Engineering, an agent of claimant’s homeowner’s insurance carrier State Farm. He also reviewed Mr. Pennington’s report and photographs regarding the damage to claimant’s home and spoke to a geologist in his own firm regarding the issues in this claim. Upon examining this information, Mr. Thomas concluded to a reasonable degree of engineering certainty that the proximate cause of claimant’s damages was due to shock induced vibrations. He testified that the shock induced vibrations probably started with the beginning of the construction work on 1-64 near claimant’s home. According to Mr. Thomas, the fact that claimant alleges to have suffered damage in such a short period of time corroborates his opinion that shock induced vibrations were the “contributing cause” of the damage to claimant’s home. Mr. Thomas also disagrees with respondent’s theory that claimant’s damages were caused by water, given the short amount of time in which the damages allegedly occurred. Mr. Thomas stated that the testimony presented by claimant that her home was not damaged prior to the incident at issue, nor was it damaged once respondent’s construction work on 1-64 was complete, corroborates his theory that claimant’s damages were caused by shock induced vibrations and not water damage or shrinkage. Thus, Mr. Thomas does not believe that water caused this damage given the short period of time that the damage occurred. However, he did testify that it was “conceivable” that the groundwater level, which was at ten feet, might affect the soil under and around claimant’s home in such a way that it intensified the shock from the construction site to claimant’s property. Mr. Thomas described this process as “saturation” or “liquefaction”. Mr. Thomas also disagrees with respondent’s theory that “soil shrinkage”caused or contributed to *18 claimant’s damages. He ruled out soil shrinkage as a possible cause since claimant has lived in the house for 27 years and she has never observed any cracking or other problems with the walls or foundation ofthe house. Furthermore, upon observing the spread footing of the house, he saw no evidence of settlement damage. Further, Mr. Thomas also testified as to his reasons for disagreeing with Mr. Pennington’s report which concluded that claimant’s damages were not caused by the construction on 1-64. He stated that Mr. Pennington neglects entirely the effect of traffic and events which occurred during the construction activity such as the dropping of concrete barriers. However, Mr. Thomas admits that he was not on site while the construction work was ongoing and that neither he nor claimant ever saw the concrete barriers being dropped. The only information he has regarding barriers being dropped during the construction proj ect comes directly from information given to him by claimant. Based upon his expertise in civil engineering and his review of the evidence he received in this claim, Mr. Thomas is of the opinion that shock induced vibration was the primary cause of the damage to claimant’s home.
John Wiseman, a project manager and estimator for Wiseman Construction Company, testified as claimant’s expert witness as to the damage done to her home and the cost of repairs. Mr. Wiseman testified that he inspected claimant’s home both inside and outside. Mr. Wiseman stated that he observed cracking in the masonry joints as well as through the block. He also observed photographs that depicted damage in the crawl space of the house which he described as the type of repair work that is labor intensive due to it being in such a confined space. The fact that it’s a confined space brings about ventilation factors which increases labor costs. Based upon these observations and factors, he estimated the total cost of repairs to be $41,225.00. However, Mr. Wiseman estimated that to replace the stucco with the vinyl siding would cost an additional $5,200.00. Mr. Wiseman stated that materials and supplies would be needed such as mortar, a lot of grout to fill voids in the structure due to slippage, paint, and wallpaper. Further, he stated that carpet and baseboards for the interior are needed as well as smaller miscellaneous items. Claimant submitted an estimate for the repair work she asserts is needed to repair the damage to her home in the amount of $41,225.00.
It is claimant’s contention that respondent knew or should have known that the strong vibrations and loud noises coming from its road construction work would cause damage to nearby houses, and that respondent’s conduct was the proximate cause of the damage to her home.
Respondent asserts that it did not perform any work during the 1-64 construction proj ect that contributed to or caused claimant’s damages. Instead, respondent asserts that claimant’s damages were caused by water and soil shrinkage.
Dr. George A. Hall, the geotechnical research engineer with the Engineering Division for respondent, testified as respondent’s expert witness. Dr. Hall first visited claimant’s property in November 2000, at the request of Bruce Leedy, one of respondent’s area engineers to whom claimant had made a complaint about the construction proj ect on 1-64 and the damages to her home. At that time, Dr. Hall viewed the inside and outside of claimant’s home. Claimant spoke with Dr. Hall on that occasion to explain to him that she had had some problems with damage to her home in 1999, but in the fall 2000, the problems worsened. At that time, Dr. Hall assumed that claimant’s property was situate on sandy soil and it was possible that vibration damage could have occurred. He thought that if there had been sufficient vibration to the sandy soil, then the kind of damages experienced by claimant to the porches and doors of her home were possible. After the instant claim was filed, however, Dr. Hall revisited the property in February 2002 to obtain soil samples. This effort took two visits as the hand auger he had *19 planned to use for obtaining the soil sample would not penetrate the soil sufficiently. On the second attempt to obtain a core boring a portable gasoline powered auger was used successfully to retrieve a core boring twelve (12) feet deep, well below the foundation level of claimant’s home. Dr. Hall performed this investigation as he had read a report prepared by Mark Pennington for State Farm Insurance Company which indicated that there was clay soil in the crawl space beneath claimant’s home. Mr. Pennington observed shrinkage cracks in the soil in the crawl space. Thus, Dr. Hall performed his own investigation of the soil and developed his expert opinions about the damages to claimant’s home based upon this investigation. First, he stated that clay soil is not susceptible to settlement from vibration because the particles are “somewhat glued together” such that these do not move during vibration. Sandy soil, particularly loose sandy soils, are subject to vibrations. The upper three feet of soil in the boring was wet which he explained was normal for the wet season of winter. The next four feet of the sample was dry soil and the water table was apparent at ten feet. The core boring revealed to Dr. Hall that the soil beneath claimant’s home is silty clay soil and the water table being at ten feet was a relatively high level. When silty clay soil dries out, Dr. Hall explained, the clay soils shrink due to loss of surface tension from the water and the particles of soil come closer together to fill the voids where water once filled the soil. When this occurs, he stated that anything resting on the soil, such as the foundation of a home, goes down with the shrinking soil. Since the drought of 1988 in West Virginia, our area experienced hotter, drier summers just prior to that drought and then again in 1999 there was another drought followed by a wet spring in 2000 with another drought. Dr. Hall mentioned these facts in explaining that was the reason that claimant started to notice significant foundation problems at that time, and it is his opinion that the shrinkage of the soil caused a portion of the damages to her home as it relates to the foundation. In fact, it is Dr. Hall’s opinion that she noticed her problems with the porches and doors suddenly because the shrinkage became sufficiently severe that cracking began to occur quickly. The stresses reached such a level that the porches lost support at the corners so the comers began to settle first thereupon inducing stresses in the house and doorways actually pushing the doors so that the tops of the doors were rubbing against the door frames. Therefore, there were damages sustained to the door frames and cracks to the porch. In his opinion, ninety per cent (90%) of the damages to the porches is the result of soil shrinkage.
Dr. Hall also addressed the expert opinion of Mr. Thomas that vibration shock caused claimant’s damages. He stated that he reviewed the construction project documents and determined that there was no blasting performed on the proj ect. He scaled the distances from the highway to claimant’s property at 200 or 300 feet from the highway closest to her property, 800 feet from the Roxalana Intersection, and 2000 feet from the Dunbar Bridges. Any vibrations from constmction activities would have, in his opinion, been too distant and would not have been significant.
As to the cracks at the ceilings in claimant’s home, Dr. Hall testified that in his opinion these were caused by water seeping into the stucco from the gutter and down spouts which were corroding and allowing water .to leak out onto the stucco. The type of cracking occurring radiates outward and this fact in his opinion supports his position that the corrosion at the down spouts are the cause of these damages. This cracking is referred to as secondary cracking since the source of the water is from the gutters and/or the down spouts.
Thus, to summarize Dr. Hall’s testimony, he opined that there are two causes for the damages to claimant’s home: the first cause is the shrinkage of soil due to the drought *20 periods, and the second cause is water getting into the stucco from the down spouts causing water damage to the interior walls of claimant’s home.
In all negligence claims, it is the burden of the claimant to establish by a preponderance of the evidence that respondent acted negligently and that the alleged negligence was the proximate cause of the claimant’s damages. Louk v. Isuzu Motors, Inc. 198 W.Va. 250, 479 S.E.2d 911 (1996). See also Roush v. Johnson 139 W. Va. 607, 80 S.E.2d 857 (1954). In the instant claim, the claimant bears the burden of proving by a preponderance of the evidence that respondent negligently caused vibrations while performing construction work on 1-64 and, further, that such vibrations were the proximate cause of the damage to claimant’s home. Absent specific evidence that the proximate cause of the damage to claimant’s property was vibrations induced by respondent, the Court is constrained to speculate as to the cause of claimant’s damages. Stephenson v. Division of Highways 22 Ct. Cl. 98 (1998). This Court has consistently held that an award cannot be based, on mere speculation. Mooney v. Dept. of Highways 16 Ct. Cl. 84 (1986); Phares v. Division of Highways 21 Ct. Cl. 92 (1996).
After a thorough review of the evidence, the Court is of the opinion that the claimant has not established that the damage to her home was caused by any specific acts or omissions on the part of the respondent. Claimant was only able to speculate that respondent may have dropped the concrete “Jersey Barriers” causing vibration induced damage to her home. However, she never saw the Jersey Barriers dropped or produced any evidence that they were dropped. Further, claimant’s expert witness based his conclusions on the claimant’s speculation that respondent may have dropped the barriers. In addition, claimant failed to produce any evidence that respondent did any blasting or otherwise committed any act or omission that proximately caused vibration damages to her home. It would be mere speculation for the Court to assume that respondent negligently induced vibrations that proximately caused the damage to claimant’s property. While sympathetic to the claimant’s position, the Court is unable to justify an award under these circumstances.
Accordingly, the Court is of the opinion to and does hereby deny this claim.
Claim disallowed.